Petar **MOJSILOVIC,** Anka **Mojsilovic,** Jelena **Mojsilovic,** et al., Petitioners,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 97–3296.

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1998.

Decided Sept. 15, 1998.

Mary L. Sfasciotti (argued), Chicago, IL, for Petitioners.

Samuel Der–Yeghiayan, Immigration & Naturalization Service, Chicago, IL; David M. McConnell, Marshall T. Golding (argued), Kristal A. Marlow, James A. Hunolt, Department of Justice, Washington, DC, for Respondent.

Before CUDAHY, EASTERBROOK and DIANE P. WOOD, Circuit Judges.

CUDAHY, Circuit Judge.

Petar and Anka Mojsilovic, who are Serbian, left the former Yugoslavia in June 1991 and entered the United States as visitors for pleasure. They were authorized to remain in the country until June 1992, but failed to depart when their authorization expired. They both filed applications for asylum and withholding of deportation, which were denied after asylum office review. In March 1994, Petar and Anka received an Order to Show Cause and Notice of Hearing from the Immigration and Naturalization Service (INS). At the hearing, which was held in July 1994, their attorney conceded deportability and asked for leave to file an amended request for asylum. The Immigration Judge (IJ) granted this request, and Petar and Anka each filed new applications on August 31, 1994. Petar's application stated that it included his two children but not his wife; Anka's application stated that it included her children and her husband. Anka's application left many questions unanswered and contained no supporting materials; Petar's application was a bit more detailed and contained a one-page addendum explaining why he believed he deserved asylum.

A hearing on the merits of the Mojsilovics' claims took place on October 13, 1994. The Mojsilovics' counsel, Gary Spraker, informed the IJ that Petar would testify first, and asked whether Anka should remain outside. This sparked a dialogue about the implications of excluding Anka from the hearing during her husband's testimony:

INS: I would move to sequester them if they're going to be both testifying.

IJ: Well, you know what, I think that's normally—I think that I would be the first one to sequester somebody but there's a due process consideration. She is a respondent in the case. . . .

INS: Then I think we have to do separate cases. We're doing two things here then and if she's also going to be testifying, it seems to me that they've had—they should have two separate asylum cases then.

. . . . .

IJ: Well, let me ask you this, Mr. Spraker, is there—well, if she would waive—if you don't have any problem with it—I mean because I think the due process requires her as a respondent to be present. . . . In this case, if they're both claiming the same thing . . . you know I think it would bolster the credibility of their case if they were separated; but I think that because they are both respondents, that it be—that each of them has a right to be here.

. . . . .

IJ: [D]o you have any objection to her having a seat in the area in the event that we have anything we can have her come in?

Spraker: Oh, no, Your Honor, the purpose of her being present would be the—if it pleases the Court for her being present because of due process consideration—whether she's present or not means nothing to us and—I don't know that her testimony will conflict with his. It may—it may be become an important issue. . . . I don't know.

R. 89–90. The IJ then instructed Anka to sit in the waiting area while Petar testified.

Petar informed the IJ that he was 45 years old and had worked in a state-owned bookstore in Belgrade prior to coming to the United States. Although he is not a member of a political party, in March 1991 Petar participated in a demonstration against Slobodan Milosevic. Between 30,000 and 50,000 people also took part in the protest. Petar explained that "whoever participated in the demonstration was either beaten up—or at-

tacked with water cannons or—in a way punished on the spot." R. 105. Petar also testified that he had served in the military in 1970 and 1971, and had received a draft notice from the Yugoslav Army soon after he departed for the United States. He stated that he did not wish to fight because "I'm against killing my own people. Because I live with those people until recently; and the politicians who are running the country now, they are actually killing their own people." R. 109. He further explained that the government was probably unaware of his feelings about the war but that, according to his friends and acquaintances, those who were drafted and did not serve "were all proclaimed deserters and the sanctions will be taken against them." R. 105.

When Petar finished, the IJ asked the Mojsilovics' attorney whether Anka would be able to add anything to her husband's testimony. The attorney replied in the negative, and Anka was called into the hearing. The IJ then summarized Petar's testimony for her:

> [M]a'am, your husband has just finished testifying. And he testified that there may be two important bases for his Request for Asylum. One of which is that he does not agree with the possible requirement that he be reinducted into the service and to kill his own people. And the other is that he indicated that he participated in a demonstration—a march of 1991—in Belgrade in front of the national theater. And that was in protest of the government. Ma'am, is there anything that concerns you about what has happened in Yugoslavia that is different than these two reasons that your husband has stated?

R. 116. Anka replied that she "would completely agree with" Petar's testimony. *Id.*

The IJ proceeded to rule on the Mojsilovics' claims. He stated that Petar was credible, but had failed to establish past persecution or any likelihood of future persecution. The IJ accordingly denied the applications for asylum and withholding of deportation, and designated Yugoslavia as the country of deportation. After some procedural maneuvering that is irrelevant for our purposes, the Mojsilovics presented their case to the Board

of Immigration Appeals. They argued that Petar had demonstrated a well-founded fear of persecution, and that the IJ had violated Anka's due process rights by sequestering her during Petar's testimony.

The Board affirmed the IJ's decision on the merits, but changed the country of deportation to Serbia. The Board found that Petar—who was not a member of a political party or organization, had participated in only one demonstration (along with at least 30,000 other people), and had testified that the government is unaware of his political beliefs—could not reasonably fear persecution upon return to Serbia. The Board also noted that a government is entitled to require military service and to enforce the requirement with reasonable penalties. *See* Order of 8/15/97 at 2 (citing *Matter of A–G–*, 19 I & N Dec. 502, 1987 WL 108955 (BIA 1987)); *cf. Rhoa–Zamora v. INS*, 971 F.2d 26, 31 n. 2 (7th Cir.1992). With respect to Anka, the Board stated that an IJ has discretion to sequester witnesses, and further commented that Anka had not demonstrated that she was prejudiced by the IJ's action.

## I. Fear of Persecution

■ As we have often explained, the Attorney General of the United States has discretion to grant asylum to any person who demonstrates past persecution or a well-founded fear of future persecution "on account of race, religion, nationality, membership in a particular social group or political opinion." *See* 8 U.S.C. § 1101(a)(42)(A); § 1158(b)(1). In addition, the Attorney General is required to withhold deportation if there is a clear probability that an alien's life or freedom would be threatened on account of any these factors. *See* 8 U.S.C. § 1253(h); *INS v. Stevic*, 467 U.S. 407, 413, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984). An alien who fails to qualify for a discretionary grant of asylum under § 1158(b)(1) cannot qualify for the more stringent mandatory withholding of deportation. *See Iliev v. INS*, 127 F.3d 638, 641 (7th Cir.1997). And whether an alien is a "refugee" and therefore eligible for asylum is a factual determination that we review under the substantial evidence test. Accordingly, we will not overturn the Board's deci-

sion about the merits of the Mojsilovics' asylum claim unless "no reasonable fact-finder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias*, 502 U.S. 478, 484, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992).

■ The Mojsilovics argue that Petar demonstrated "a well-founded fear of persecution on account of his objections to military service in an army that has been universally condemned for committing crimes against humanity." Petitioner's Br. 33. There are a number of responses to this argument; perhaps the most obvious is that this is not quite what Petar testified at the deportation hearing. When asked why he opposed military service, Petar explained, "I don't wish to fight with people that I lived with until yes—yesterday." R. 102. He later elaborated, "I'm against killing my own people. Because I live with those people until recently; and the politicians who are running the country now, they are actually killing their own people." R. 109. At least on the surface, these comments only reflect the unpleasant realities of civil war and seemingly do not contemplate the ethnic cleansing and other atrocities that have taken place during the Balkan conflict. But even if we accepted Petar's assertion that in light of the "elementary facts of contemporary history," Petitioner's Br. 33 (citing *Osmani v. INS*, 14 F.3d 13 (7th Cir.1994)), the Board should have understood him to be opposed to service in a "universally condemned" army, Petar's claim for asylum still fails.

■ Congress established the basic framework that governs claims for asylum when it passed the Refugee Act of 1980, Pub.L. 96–212, 93 Stat. 102. One of primary purposes of the Act was to conform the law of the United States with the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, to which the United States became a party in 1968. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 436–37, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). The United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status (Geneva 1979) [hereinafter *Handbook*] helps interpret the Protocol's definition of "refugee." As such, the *Handbook*—although it is not binding and lacks the force of law—provides useful guidance in interpreting the meaning of "refugee" for the purposes of 8 U.S.C. § 1158(b)(1). *See Cardoza–Fonseca*, 480 U.S. at 439 n. 22, 107 S.Ct. 1207; *Garcia v. INS*, 7 F.3d 1320, 1325 (7th Cir. 1993). With respect to draft evaders, the *Handbook* recognizes that there are "cases where the necessity to perform military service may be the sole ground for a claim to refugee status...." *Handbook*, ¶ 170. But the *Handbook* also cautions:

> Not every [political, religious or moral] conviction, genuine though it may be, will constitute a sufficient reason for claiming refugee status after desertion or draft-evasion. It is not enough for a person to be in disagreement with his government regarding the political justification for a particular military action. Where, however, the type of military action, with which an individual does not wish to be associated, is condemned by the international community as contrary to basic rules of human conduct, punishment for desertion or draft-evasion could, in light of all other requirements of the definition, in itself be regarded as persecution.

*Handbook*, ¶ 171. Herein lies the problem with Petar's claim.

■ This excerpt explains that it is the *punishment* for refusing to serve in an internationally condemned military—not the mere summons to serve—that constitutes persecution. Therefore, when an alien does not wish to be associated with a military that engages in universally condemned acts of violence, "the only relevant factor is the likelihood that the alien will be punished." *M.A. A26851062 v. INS*, 858 F.2d 210, 214–15 (4th Cir.1988). Here the bulk of the evidence suggests that the Yugoslav Army will not sanction Petar for failing to respond to his draft notice. The State Department reports that many males avoid compulsory service, that draft dodgers are not pursued aggressively, and that approximately 100,000 eligible males are living abroad and there is no pattern of arrest or harassment when they return home. R. 126–27. Although aliens are free to rebut the Department's information—here

Petar testified that those who avoid military service are punished—this sort of unsubstantiated testimony is not enough to cast doubt on the findings of the State Department. *See Gramatikov v. INS*, 128 F.3d 619, 620 (7th Cir.1997). And when one considers that Petar will be at least 50 years by the time he returns to Serbia, the likelihood of punishment seems especially remote. Accordingly, on this record, Petar has failed to establish a "well-founded fear of persecution" upon his return to Serbia.

■ We have commented before that asylum cases are difficult, in part because they "move so sluggishly through the administrative and judicial process that by the time they reach us, the relevant political circumstances may have significantly changed." *See Balazoski v. INS*, 932 F.2d 638, 643 (7th Cir.1991). Indeed, Petar filed his first asylum application in 1993, when conditions in the former Yugoslavia were far different from what they are now. *See generally* Michael Moodie, *The Balkan Tragedy*, 541 *The Annals of the American Academy of Political and Social Science* 101 (Sept.1995), Valerie Epps & Michael Scharf, *The International Trial of the Century? A "Cross Fire" Exchange on the First Case Before the Yugoslavia War Crimes Tribunal*, 29 Cornell Int'l L.J. 635 (1996). And even since the briefing of the appeal, fighting has broken out between Serbian forces and ethnic Albanians in Kosovo. As "foreign affair novices," *Balazoski*, 932 F.2d at 643, we do not know whether these latest developments will affect the treatment Petar receives upon his return to Serbia. But because courts of appeal do not take evidence, and because of "[t]he extremely fact-intensive nature of these inquiries and the relatively underdeveloped shape in which

they reach us," our role in asylum proceedings is necessarily limited. *Id.*; *cf. Asani v. INS*, 154 F.3d 719, 726–27 (7th Cir.1998).

## II. Ineffective Assistance of Counsel

■ Anka's ineffective assistance of counsel claim is based largely on the fact that her attorney allowed her to be sequestered during her own deportation hearing. Of course, deportation hearings are civil proceedings and therefore aliens do not have a right to counsel under the Sixth Amendment. *See Castaneda–Suarez v. INS*, 993 F.2d 142, 144 (7th Cir.1993). But we have held that "counsel at a deportation hearing may be so ineffective as to have impinged upon the fundamental fairness of the hearing in violation of the fifth amendment due process clause." *Id.* (internal quotation marks and citation omitted).

■ Unfortunately for Anka, we lack jurisdiction over her ineffective assistance claim because she did not raise it before the Board.[1] An alien must exhaust her administrative remedies before seeking review of a deportation order, *see* 8 U.S.C. § 1105a(c), and an alien who fails to raise an issue before the Board has not fulfilled this exhaustion requirement, *see Vargas v. INS*, 831 F.2d 906, 907-08 (9th Cir.1987). Although due process claims do not usually require exhaustion because the Board cannot adjudicate constitutional issues, the requirement applies when the "petitioner's claim involves procedural errors correctable by the administrative tribunal." *Castaneda–Suarez*, 993 F.2d at 144 (internal quotation marks and citations omitted). Here, of course, the Board had the authority to remand the case to the IJ and

1. Anka argues vigorously that she raised ineffective assistance of counsel before the Board, but her argument is disingenuous. After the deportation hearing, her attorney filed a notice of appeal and paid the required fee. But for reasons that are not entirely clear from the record, the appeal was not pursued. The Mojsilovics retained a new attorney, who filed a motion to reopen. The motion explained that "the failure to procedurally effectuate the appeal was either due to administrative error, or excusable ineffective assistance of counsel which should not unreasonably work to the detriment of the respondent." R. 25. In contrast, the brief that was

filed when the Mojsilovics' case was before the Board did not argue that their attorney had been ineffective at the deportation hearing. *See* R. 814. Therefore, while the Mojsilovics' motion to reopen suggested that their appeal may have floundered due to ineffective assistance of counsel, there was no similar suggestion about the hearing. Anka did argue that the IJ violated her due process rights when he ordered sequestration. Presumably she did not make the same argument on appeal to this court because she assumed that we would invoke waiver, given that her attorney not only failed to object to the sequestration, but was the one who suggested it.

order him to conduct a deportation hearing with Anka in the room.

Normally we would end our discussion of the ineffective assistance of counsel claim here, but the peculiar events at the hearing compel us to say a bit more about Anka's claim. *Cf. Kossov v. INS*, 132 F.3d 405, 408 (7th Cir.1998). It seems as if Anka would have been unable to prevail on her ineffective assistance claim, even if she had presented it to the Board. To be successful, Anka would have to demonstrate not only that her counsel was ineffective, but also that she was prejudiced by this ineffectiveness. *See Saleh v. INS*, 962 F.2d 234, 241 (2nd Cir.1992). In other words, Anka would have to demonstrate that if she had been present for the entire deportation hearing, she would have done or said something that would have changed its outcome. The record leaves little doubt that the performance of Anka's attorney (and, for that matter, the IJ) was abysmal. We should not need to explain that a hearing—which is supposed to provide the alien with an opportunity to be heard—is not to be conducted while the alien is standing outside the room. And even if Anka's claim was derivative of, not separate from, Petar's claim—and there was some discussion of this at the hearing, *see* R. 86—relegating her to the hallway was utterly pointless. A judge sequesters witnesses "to prevent falsification and to uncover fabrication that has already taken place." *Weinstein's Federal Evidence*, § 615.02[1], (2nd edition) (footnotes omitted). In other words, the whole purpose of sequestration is to ensure that a witness is untainted by the testimony of others. Accordingly, nothing is gained by sequestering a witness, summarizing the testimony she was not allowed to hear, and then asking her whether she has anything to add. But, as we have explained, regardless of how badly Anka's attorney (and the IJ) bungled the simple concept of sequestration, Anka does not have an ineffective assistance claim (or a due process claim, for that matter) unless she can show prejudice. And there is no evidence in the record—or indeed, even a suggestion independent of the record—that the outcome of the hearing would have been different if Anka had been allowed to stay in the room. We hope, however, that the ineptness demonstrated at the Mojsilovics' hearing was an anomaly that will not reoccur.

AFFIRMED.