# United States Court of Appeals
## For the First Circuit

Nos. 03-1037, 03-1372

ABDEL HAMID MEKHOUKH,

Petitioner,

v.

JOHN ASHCROFT, ATTORNEY GENERAL

Respondent.

ON PETITIONS FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, <u>Circuit Judge</u>,
Cyr, <u>Senior Circuit Judge</u>,
and Oberdorfer,[*] <u>Senior District Judge</u>.

<u>Gerald D. Wall</u>, with <u>Greater Boston Legal Services</u> on brief, for petitioner.
<u>Paul Fiorino</u>, Attorney, with <u>Peter D. Keisler</u>, Assistant Attorney General, and <u>Richard M. Evans</u>, Assistant Director, Office of Immigration Litigation, on brief, for respondent.

February 13, 2004

---

[*]Of the District of the District of Columbia, sitting by designation.

**OBERDORFER**, <u>**Senior District Judge**</u>.  Abdel Hamid Mekhoukh, a native and citizen of Algeria, petitions for review of a decision of the Board of Immigration Appeals, denying his application for asylum, withholding of removal, and relief under Article 3 of the United Nations Convention Against Torture.  We deny the petition for review.

## I.  BACKGROUND

This case arises against the background of the ongoing and well-documented turmoil that has engulfed Algeria since late 1991.  See generally Bureau of Democracy, Human Rights and Labor, United States Department of State, 1999 Country Reports on Human Rights Practices – 1999: Algeria (Feb. 25, 2000) (AR 1014-1031) ("1999 Country Reports"); Bureau of Democracy, Human Rights and Labor, United States Department of State, Algeria – Profile of Asylum Claims and Country Conditions (June 1998) (AR 995-1013) ("1998 Profile of Asylum Claims"); <u>see</u> <u>also</u> <u>Mediouni</u> v. INS, 314 F.3d 24, 25 (1st Cir. 2002); <u>Debab</u> v. <u>INS</u>, 163 F.3d 21, 23 (1st Cir. 1998); <u>Meguenine</u> v. <u>INS</u>, 139 F.3d 25, 26 (1st Cir. 1998).  The conflict began when the ruling party, the National Liberation Front (FLN), foreseeing a loss to an Islamic fundamentalist party, the Islamic Salvation Front (FIS), cancelled the second round of scheduled democratic elections.  The military then took power from the civilian President.  These events caused significant unrest in the country.  Since then, the government of Algeria has been

engaged in a brutal conflict with radical Islamic parties, resulting in over 100,000 deaths. Torture and other human rights abuses, including the killing of innocent civilians, have been perpetrated by both the armed insurgents and the government's security forces. See 1999 Country Reports 1 (AR 1014) ("The security forces committed numerous serious human rights abuses."); 1998 Profile of Asylum Claims 5 (AR 999) ("Security forces commit serious abuses. They were responsible for numerous disappearances, carried out extra-judicial killings, routinely tortured and otherwise abused detainees, and arbitrarily arrested and detained or held incommunicado many individuals suspected of involvement with armed Islamic groups."); see also Meguenine, 139 F.3d at 26 ("Both sides have acted with considerable brutality toward the civilian population.").

Mekhoukh, an ethnic Berber,[1] was born on April 28, 1967, in Algiers, Algeria. During the years he lived in Algeria, from birth until 1997, he supported Berber causes, but he was not an activist. On one occasion, around 1985, when he was about 18, he met, and had his picture taken with Lounes Matoub, a popular entertainer and Berber activist who was assassinated by Islamic radicals in 1998. While he was in Algeria, Mekhoukh suffered no

---

[1]The Berbers were the original inhabitants of Algeria. Bureau of Democracy, Human Rights and Labor, United States Department of State, Algeria – Profile of Asylum Claims and Country Conditions 11 (June 1998) (AR 1005).

persecution on account of his Berber ethnicity or his support of Berber causes.

In approximately 1988, Mekhoukh received his first draft notice. Mekhoukh was then enrolled at a university and eligible for an educational deferment. In late 1991, the university temporarily closed due to political unrest in the country. See infra. When it reopened in the spring of 1992, Mekhoukh did not return. At that point, he was no longer entitled to an exemption from military service, but he continued to avoid his military obligation by filing false educational certificates. While he was in Algeria, Mekhoukh never claimed that he had a conscientious objection to military service in the Algerian military; nor did he ever inquire about the possibility of alternative service. Mekhoukh received draft notices after he left the university, but the record does not establish when those notices were received, how many were received, or their content.[2] Mekhoukh remained in Algeria, working, until 1997. During those five years, between 1992 and 1997, Mekhoukh experienced no negative consequences as a result of his fraudulent avoidance of military service.

When the conflict in Algeria started in 1991, Mekhoukh did not align himself with either the ruling party or the FIS. His

_____

[2]The immigration judge accepted Mekhoukh's proffer that he had received additional draft notices. We note, however, that copies of draft notices were not among the additional documents submitted by Mekhoukh with his appeal to the Board.

-4-

position was, and remains today, that the government should not have cancelled the elections and that the FIS had the right to rule if democratically elected. While he was in Algeria, Mekhoukh suffered no persecution on account of these political opinions.

Mekhoukh left Algeria in 1997 and reached the United States in 1998, entering on a forged French passport. After leaving the United States for New Zealand, where his application for asylum was denied, he reentered the United States in October 1999. He was detained by the INS and determined to be deportable. He then applied for asylum, for withholding of deportation, and for protection under the United Nations Convention Against Torture. After a number of continuances, the retention and firing of one attorney, and several changes of venue (from Los Angeles to Houston to Boston), Mekhoukh finally filed his official application for asylum, withholding of removal and protection under the Convention Against Torture on October 20, 2000. (His application for asylum was just barely within the one-year time limit that applies to asylum claims). At the initial proceeding, Mekhoukh was advised that he had the right to be represented by counsel at his hearing, although not the right to appointed counsel. He was given a list of persons and organizations he could contact for help in finding an attorney. A hearing date of February 8, 2001, was set, giving him over three months to find counsel and prepare.

On February 8, 2001, Mekhoukh appeared for his hearing late and without counsel. He asked for a continuance, saying that he had important documents on the way and that he wanted to obtain an attorney. The immigration judge denied his motion, noting that Mekhoukh had been in the country for more than a year, that three months had passed since he had filed his official application, and that it would be unfair to other applicants to squander the three hours she had set aside for his case. However, she accepted his proffer as to what the additional documentary evidence would show. An interpreter was present at the hearing, although Mekhoukh himself testified mostly in English.

At the conclusion of his hearing, the immigration judge issued an oral decision denying Mekhoukh's application for asylum, for withholding of deportation, and for protection under the United Nations Convention Against Torture. She concluded that Mekhoukh failed to meet his burden to show a well-founded fear of persecution, and necessarily failed to show a likelihood of persecution, on account of his ethnicity, political opinions, and/or his avoidance of military service.

Mekhoukh appealed to the Board of Immigration Appeals. He provided the Board with additional documentary evidence, including a copy of his forged school certificate for the year 1994-95, a copy of his picture with Matoub, and copies of a number of government reports and media publications, documenting the

violence and human rights abuses that have been endemic in Algeria since 1991. He did not submit copies of any draft notices. He asked the Board either to reverse on the existing record or to remand his case to the immigration judge for further consideration in light of this additional evidence. On December 4, 2002, the Board of Immigration Appeals affirmed, without opinion, making the immigration judge's decision the final agency determination. See 8 C.F.R. § 1003.1(e)(4).

Mekhoukh moved for reconsideration, contending that the Board had failed to consider his new evidence and that he was entitled to a remand to permit the immigration judge to consider it. He also argued that the Board's decision to affirm without opinion was improper where new evidence was proffered. The Board denied the motion on February 13, 2002. It stated that it had considered Mekhoukh's new evidence prior to affirming the immigration judge's decision. It further noted that to the extent Mekhoukh was objecting to the fact that it affirmed without opinion, such motions were barred by regulation. See 8 C.F.R. § 1003.2(b)(3).

Mekhoukh petitions for review of the denial of his application for asylum, for withholding of deportation, and for protection under the Convention Against Torture.

## II. DISCUSSION

We have jurisdiction over Mekhoukh's appeal pursuant to 8 U.S.C. § 1252(b)(4).

### A.        Standard of Review

Our review of an order of removal is circumscribed by statute.  A court of appeals must decide a petition for review "only on the administrative record on which the order of removal is based."  8 U.S.C. § 1252(b)(4)(A).  "[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be *compelled* to conclude to the contrary," id. at 1252(b)(4)(B) (emphasis added), and "a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law," id. at 1252(b)(4)(C).

### B.        Asylum

In order to be eligible for asylum, an alien must be a "refugee within the meaning of section 1101(a)(42)(A) of [Title 8 of the United States Code]."  8 U.S.C. § 1158(b)(1).  A "refugee" is defined, in relevant part, as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

8 U.S.C. § 1101(a)(42); see also Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003).[3] An asylum applicant bears the burden of establishing that he or she falls within the statutory definition of "refugee." See 8 C.F.R. § 208.13(a); see also Fesseha v. Ashcroft, 333 F.3d 13, 18 (1st Cir. 2003).

Mekhoukh does not claim that he has suffered any persecution in the past, but that he has a "well-founded fear of persecution" if he returns to Algeria. An applicant has a "well-founded fear of persecution" if "(A) [t]he applicant has a fear of persecution in his or her country of nationality . . . on account of race, religion, nationality, membership in a particular social group, or political opinion; (B) [t]here is a reasonable possibility of suffering such persecution if he or she were to return to that country; and (C) [h]e or she is unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear." 8 C.F.R. § 208.13(b)(2)(i). Thus, a well-founded fear of persecution has both subjective and objective components: (1) subjectively, the asylum-seeker must show a genuine fear of persecution, and (2) objectively, the record must show "by credible, direct, and specific evidence, . . . facts that would support a reasonable fear that the petitioner faces

---

[3]Obtaining asylum is actually a two-step process. If an alien successfully demonstrates that he/she is eligible for asylum, then the Attorney General has the discretion to decide whether or not to grant asylum. 8 U.S.C. § 1158(b)(1).

persecution."  See Guzman v. INS, 327 F.3d 11, 16 (1st Cir. 2003) (quoting Ravindran v. INS, 976 F.2d 754, 758 (1st Cir. 1992) (quoting Alvarez-Flores v. INS, 909 F.2d 1, 5 (1st Cir. 1990))).

The immigration judge accepted Mekhoukh's claim that he feared persecution, but concluded that the record evidence did not establish that his fear was well-founded.  On appeal, Mekhoukh contends that the immigration judge erred in her weighing of the record evidence; he maintains that the record demonstrates that his fear of persecution on account of his ethnicity, his political opinions and/or his avoidance of military service is well-founded. He also raises several procedural issues, challenging the fairness of his hearing before the immigration judge and the Board's abbreviated review of that decision.

### 1.    Ethnicity and Political Opinions

Mekhoukh first claims he has a well-founded fear of persecution based on his ethnicity and political opinions because he is a Berber, he supports Berber causes, and he is likely to be perceived as a Berber activist.  In order to be eligible for asylum on this ground, Mekhoukh must demonstrate that there is a "reasonable possibility" that he is likely to be identified as a target for persecution on account of his ethnicity or political opinions.  See Debab, 163 F.3d at 27 ("Generally, evidence of widespread violence and human rights violations affecting all citizens is insufficient to establish persecution." (internal

-10-

quotations omitted)); see also 1998 Profile of Asylum Claims 7 (AR 1001) ("[I]t is important in our view to differentiate between: Algerian political asylum applicants with legitimate fears based on who they are and what they have done; and the majority of applications – many of whom are young adults whose personal security situation does not appear to be very different from that faced by the Algerian population at large and who may be seeking to escape the turmoil or find better economic opportunities in the United States.") The immigration judge concluded, and we agree, that the record does not support such a finding.

We consider first whether Mekhoukh's Berber ethnicity in and of itself renders him eligible for asylum. Under certain limited circumstances, an applicant may be eligible for asylum without providing evidence that he "would be singled out individually for persecution if:. . . (A) [he] establishes that there is a pattern or practice in his or her country of nationality . . . of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and . . . (B) [he] establishes his or her own inclusion in, and identification with, such group of persons such that his or her fear of persecution upon return is reasonable." 8 C.F.R. § 208.13(b)(2)(iii). While there is no issue as to Mekhoukh's Berber ethnicity, the record does not support, much less compel, the

conclusion that there is a "pattern or practice" of persecution directed at persons of Berber ethnicity. Cf. Mequenine, 139 F.3d at 28 (asylum claim denied because no pattern or practice of targeting neutral health care workers in Algeria). According to the State Department, "there may be some discrimination and harassment of Berbers in the capital city of Algiers and other large towns, but there is no pattern of action by the Algerian authorities against Algerians simply because they are of Berber origin." 1998 Profile of Asylum Claims 12 (AR 1006). None of the evidence proffered by Mekhoukh, before the immigration judge or to the Board, compels a contrary finding. Accordingly, Mekhoukh's Berber ethnicity by itself does not demonstrate his eligibility for asylum.

We consider next Mekhoukh's claim that he has a well-founded fear of persecution based on his Berber ethnicity combined with his support for Berber causes. Again, as there is no evidence that similarly situated persons have been targeted for persecution, Mekhoukh cannot rely solely on his inclusion in that group to support his asylum claim. 8 C.F.R. § 208.13(b)(iii). Nor are those characteristics likely to cause the government to single him out for persecution.

Mekhoukh also contends, however, that there is a reasonable possibility that he will be "perceived" as an activist

for Berber causes and persecuted.[4]  Even assuming that the record supported Mekhoukh's claim that Berber activists as a group face systematic persecution, it does not establish a reasonable possibility that Mekhoukh would be perceived as a member of this group.  See 8 C.F.R. § 208.13(b)(2)(iii)(B).  Mekhoukh claims that he could be perceived as an activist because of his Berber ethnicity, his support of Berber causes, and the fact that he had his picture taken, in approximately 1985, with a renowned activist, Lounes Matoub.  It is hard to imagine that these facts would ever result in the government labeling Mekhoukh an activist; they certainly do not compel that conclusion, especially when the other record evidence is considered.  For example, Mekhoukh remained in Algeria for a number of years after the picture was taken without ever experiencing any persecution.  And no member of his family has ever been persecuted. See Aguilar-Solis v. INS, 168 F.3d 565, 573 (1st Cir. 1999) ("[T]he fact that close relatives continue to live peacefully in the alien's homeland undercuts the alien's claim that persecution awaits his return.").  It is similarly impossible to imagine that these facts would lead the government to target Mekhoukh for persecution.  Cf. Meguenine, 139 F.3d at 29 ("[T]he Board could reject [the applicant's] fears of specific harm on this record as insufficiently severe and particular to support

_____

[4]Mekhoukh admits that he is not, and never has been, an activist.

-13-

eligibility for asylum . . . .").  Accordingly, we agree with the immigration judge that Mekhoukh's fear of persecution based on his Berber ethnicity and support of Berber political causes is not well-founded.

In a slight modification of his argument, Mekhoukh also claims that he is likely to be targeted for persecution because of his political opinion that the government should not have cancelled democratic elections in 1991, that the Islamic fundamentalist party has the right to rule if democratically elected and that the present government is illegitimate.  Even assuming that Mekhoukh's "neutrality" qualifies as a political opinion for asylum purposes,[5] there is simply no evidence in the record that persons who hold this opinion are targeted for persecution or that Mekhoukh himself is likely to be identified as such a person and targeted.

Mekhoukh, if he returns to Algeria, may well be at risk because of the ongoing violence between the government's security forces and armed insurgent groups.  However, the record does not support Mekhoukh's claim that he faces persecution for his ethnicity or political opinions.  Accordingly, we agree with the immigration judge that Mekhoukh has not proved a well-founded fear of persecution based on either his ethnicity or political opinions.

---

[5]For a discussion of the standard for determining when an applicant is eligible for asylum when the applicant faces the prospect of persecution because of a political opinion of neutrality, see <u>Novoa-Umania</u> v. <u>INS</u>, 896 F.2d 1, 3 (1st Cir. 1990).

-14-

## 2.    Evasion of Military Service

Mekhoukh also claims he has a well-founded fear of persecution based on his avoidance of military service.  Even though a sovereign nation enjoys the right to enforce its laws of conscription, and normal penalties for evasion generally are not considered persecution, see Selective Draft Law Cases, 245 U.S. 366, 378 (1918), two types of asylum claims can arise based on avoidance of military service.  First, an alien may be eligible for asylum if  "refusal to serve in the military results not in normal draft evasion penalties, but rather in disproportionately severe punishment on account of one of the five grounds enumerated in the . . . Refugee Act."  See M.A. v. INS, 899 F.2d 304, 312 (4th Cir. 1990) (citing Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status ¶¶ 169, 171 (Geneva 1979) ("Refugee Handbook")).[6] Second, an alien is eligible for asylum if "the alien would be associated with a military whose acts are condemned by the international community as contrary to the basic rules of human conduct."  Id.; see also Vujisic v. INS, 224 F.3d 578, 580 (7th Cir. 2000); Mojsilovic v. INS, 156 F.3d 743, 746 (7th Cir. 1998).

---

[6]Although not binding and lacking the force of law, the Refugee Handbook has been recognized as providing significant guidance interpreting the term "refugee" in 8 U.S.C. § 1158(b)(1). See INS v. Cardoza-Fonseca, 480 U.S. 421, 439 n.22 (1987); M.A. v. INS, 899 F.2d at 312; Mojsilovic v. INS, 156 F.3d 743, 747 (7th Cir. 1998).

-15-

Under those circumstances, "punishment for desertion or draft evasion could . . . in itself be regarded as persecution." Vujisic, 224 F.3d at 581 (quoting Refugee Handbook ¶ 171). Mekhoukh claims he is eligible for asylum on both accounts.

### a. Excessive Punishment

Mekhoukh's claim that his draft evasion will lead the government to label him as an Islamic fundamentalist sympathizer and a terrorist and, therefore, to target him for abuse or death, has little support in the record. As noted above, Mekhoukh's own testimony establishes that he has not been an activist in any way and that he has never identified himself as a supporter or sympathizer with any of the armed insurgent groups, making it unlikely that the Algerian government would label him a terrorist and impose a disproportionately severe punishment on him for his draft evasion. Moreover, there is no evidence that the Algerian government is likely to label draft evaders as terrorists or target them for persecution.[7] Absent such evidence, Mekhoukh is not eligible for asylum on this basis. See M.A. v. INS, 899 F.2d at 314 (petitioner "failed to show that he would be singled out for his refusal to serve").

---

[7]Although we do not rely on it, we note that this conclusion is supported in a recent report from the United Kingdom, see Country and Information Policy Unit, Home Office, United Kingdom, Algeria, Country Report §§ 5.86 – 5.95 (October 2003) ("United Kingdom Country Report").

### b. Conscientious Objection

Mekhoukh also claims that he avoided his military service in Algeria, and wants to continue to avoid it, because he objects to serving in a military that is known to commit human rights abuses. Mekhoukh is eligible for asylum on this ground only if (1) the Algerian military has been condemned by the international community as a military that commits human rights abuses; (2) there is a reasonable possibility that Mekhoukh will have to serve in that military if he returns to Algeria or face punishment for refusing to serve; and (3) Mekhoukh has a genuine conscientious objection to service. Mekhoukh bears the burden of establishing these facts.

### i. Nature of Algerian Military

It is difficult to discern from the immigration judge's oral decision whether she expressly considered and/or made a finding about the nature of the Algerian military, but the record clearly establishes that the Algerian military is a military whose acts are condemned by the international community as contrary to the basis rules of human conduct.[8] See, e.g., 1999 Country Reports 1 (AR 1014) ("security forces have committed numerous serious human rights abuses"); see also 1998 Profile of Asylum Claims 7 (AR 1001)

---

[8]The immigration judge acknowledged that the State Department's 1999 Country Report for Algeria was entered into evidence, but she never refers to what it says about the Algerian security forces and their human rights abuses.

-17-

("security forces have allegedly resorted to the arrest, interrogation, and torture of persons suspected of having Islamist sympathies").[9]

### ii.  Military Service

An alien's claim to asylum based on his objection to serving in an internationally condemned military requires proof that there is a reasonable possibility that the alien will have to serve or be punished for refusing to serve.  See Mojlisovic, 156 F.3d at 747.[10]  The immigration judge concluded that Mekhoukh failed to meet his burden of proof on this point because he failed to establish that alternative service was not available or to ask about the possibility of non-combat positions.  Mekhoukh contends that she assigned too much weight to this particular fact.  He points out on appeal that there are many practical reasons why an alien might fail to inquire about the possibility of alternative

---

[9]More recent State Department Reports indicate that circumstances in Algeria have improved slightly, but not materially changed.  See, e.g., Bureau of Democracy, Human Rights and Labor, United States Department of State, Country Reports on Human Rights Practices – 2002: Algeria (March 31, 2003).

[10]In Mojsilovic, the court found that the applicant failed to meet his burden where "the bulk of the evidence suggests that the Yugoslav Army will not sanction [the petitioner] for failing to respond to his draft notice."  156 F.3d at 747.  It noted that the applicant's testimony that draft evaders were punished did not overcome "[t]he State Department reports that many males avoid compulsory service, that draft dodgers are not pursued aggressively, and that approximately 100,000 eligible males are living abroad and there is no pattern of arrest or harassment when they return home."  Id.

-18-

service.[11]  But he apparently failed to advance these reasons to the Immigration Judge; nor does he seriously claim that they apply to him.  His real reason for not inquiring, suggested by his testimony and clearly asserted on appeal, is that he thought any inquiry would be futile.  He asserts, without any supporting evidence, that it is inconceivable that the Algerian military would give a conscripted soldier the option of choosing a non-combat position.  His assertion may be correct, and any inquiry may have been futile.  But his failure to make any inquiry or to justify his failure does, as the immigration judge concluded, amount to a failure to satisfy his burden of proving that if he returned to Algeria he would, in fact, have to serve in Algeria's military in a combat position.  Certainly, the weight the immigration judge assigned to this fact was not "manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C).

Indeed, had Mekhoukh addressed his burden of proving his assertion that a non-combat assignment was unavoidable by inquiring about it, he might have discovered, as have we, that Algeria has adopted a "Regularization" program for males of a certain age who have not fulfilled their military service, under which they may be excused from any further obligation.  According to the 1999 Report

---

[11]For example, practical difficulties, such as residence in the United States, lack of contacts within the country of origin, or lack of resources, might impede such an inquiry.

of the INS Resource Information Center,[12] which was available at the time of Mekhoukh's immigration hearing, Algeria has established a program to permit draft evaders, even those who are residing outside of Algeria, to apply for "regularization" of their status. See id. ("Algerians aged 27 and over who have not done military service are currently being invited to apply for an exemption from military service. It is still not clear who exactly will benefit from such registration, but it appears that many individuals considered draft evaders or who presently have a deferral may be included.").[13]

Mekhoukh had the burden of proving that if he returned to Algeria he would be drafted, assigned to combat duty, and become

---

[12]INS Resource Information Center, Response to Information Request No. DZA0002.znk (Washington, D.C., Oct. 4, 1999).

[13]A more detailed description of the regularization option appears in the United Kingdom Report: "During 1999 and 2000 measures were initiated to regulari[z]e the situation of men who had not undertaken their conscription. The reasons given include the Algerian military authorities wish to relax the requirements for military service, the high cost of military training, overpopulated barracks, and the situation of young men who are unable to obtain official documents and obtain employment." § 5.73. According to this report, "[b]y February 2001, 25,000 registrations had been made from abroad. If everything is found in order the applicants finally receive a dispensation document . . . . If they are staying abroad they can apply to the consulate and fill out an application form. They can return to Algeria subsequently without a problem." Id. § 5.74. Presently, all men born before December 31, 1980, are eligible to apply for regulari[z]ation. Id. § 5.76-5.77. Persons who had deferments or who had been called to service are eligible to apply; persons subject to a "wanted notice" or deserters are not eligible. Id. § 5.78-5.79.

obligated to commit human rights violations.  His burden included pursuit of evidence to sustain his assertion.  He has failed to do so.

### iii. Genuine Conscientious Objection

The immigration judge did not make a finding as to whether Mekhoukh has a genuine conscientious objection to service, but that is immaterial as Mekhoukh's claim was properly rejected on other grounds.

### 3.    Credibility

The immigration judge found that Mekhoukh was "not a credible witness.  He has made many assertions that are unfounded, not corroborated and are simply improbable."  (AR 866.)  Mekhoukh challenges this finding on appeal.  We need not address this issue as the immigration judge rejected Mekhoukh's asylum claim, and we have reviewed and approved that rejection, without relying on the adverse credibility finding.

### 4.    Procedural Fairness of Immigration Hearing

Having concluded that the existing record fails to establish Mekhoukh's eligibility for asylum, we must consider his claim that procedural flaws compromised the fundamental fairness of his hearing before the immigration judge and necessitate a remand. "It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."  Morales v. INS, 208 F.3d 323, 327 n.1 (1st Cir. 2000) (quoting Reno v. Flores, 507

U.S. 292, 306 (1993)). Mekhoukh contends his hearing was unfair because of his lack of counsel, the incompetency of the interpreter, and the immigration judge's failure to fully develop the record. We apply de novo review to a claim that an administrative law judge violated a party's right to due process. Aguilar-Solis v. INS, 168 F.3d at 568.

### a. Lack of Counsel

Mekhoukh first contends that the hearing before the immigration judge was fundamentally unfair because his lack of counsel hindered his ability to present his case, particularly given the language barriers. The absence of counsel in and of itself cannot support Mekhoukh's claim. A petitioner in an asylum proceeding is not entitled to appointed counsel. Moreover, the immigration judges throughout this proceeding have more than fulfilled their obligation to inform Mekhoukh of his rights and options with respect to counsel. Before the case was transferred to Boston, at Mekhoukh's request, he had retained and dismissed one counsel. After he filed his official application in Boston, the immigration judge for his case informed him that he was entitled to retain counsel, continued the hearing for several months in order to give him time to do so, and provided him with a list of contacts. Under such circumstances, it was certainly reasonable for the immigration judge not to give him any additional time when,

three months later, he appeared without counsel on the day of his hearing.

### b.    Quality of Translation

Mekhoukh also contends that his hearing was fundamentally unfair because the interpreter was incompetent.  He argues that the interpreter's errors led to an inaccurate portrayal of his testimony with respect to the substance of his claim for asylum and created apparent conflicts in his testimony that led the immigration judge to make an adverse credibility determination.

On the first point, although the interpretation of Mekhoukh's testimony was not flawless, Mekhoukh fails to identify a single instance where the transcript reflects a material mistake in the interpretation of his testimony.  And having reviewed the transcript in its entirety, we see no indication that any of the errors in interpretation had any, much less a serious, effect on the accuracy of the hearing record.  To the contrary, the transcript establishes that most of the mistakes in interpretation were almost immediately caught, by Mekhoukh himself, and corrected. For example, Mekhoukh makes much of the translator's mistake in interpreting "Berberic" as "barbaric," but that error was identified and corrected almost immediately.  These errors, while unfortunate, did not render Mekhoukh's hearing fundamentally unfair.  As for Mekhoukh's contention that errors in translation negatively affected the immigration judge's evaluation of

Mekhoukh's credibility, we have resolved the merits of Mekhoukh's appeal without reference to the immigration judge's adverse credibility finding. Accordingly, even if translation errors affected the immigration judge's credibility finding, they did not deprive Mekhoukh of a fair hearing.

### c.     Hearing Record

Mekhoukh also contends that his hearing was fundamentally unfair because the immigration judge failed to fully develop the record.[14] Mekhoukh contends that the  immigration judge failed to meet this obligation because she failed to ensure a competent translator. However, as discussed above, Mekhoukh has failed to demonstrate that there were any errors in the translation that seriously affected the accuracy of the material information in the

---

[14]As explained by the Second Circuit, this duty exists because,

the IJ whose decision the Board reviews, unlike an Article III judge, is not merely the fact finder and adjudicator but also has an obligation to establish the record. 8 U.S.C. § 1229a (b)(1) ("The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses."); United Nations Handbook on Procedures & Criteria for Determining Refugee Status: Office of the United Nation's High Commissioner for Refugees, para. 196; 205(b)(i) (1979) (stating that the asylum statute contemplates that "the duty to ascertain and evaluate all the relevant facts is shared between the applicant and examiner" and that the asylum adjudicator must "ensure that the applicant presents his case as fully as possible and with all available evidence").

Yang v. McElroy, 277 F.3d at 162.

hearing record. Accordingly, we find Mekhoukh's claim that the immigration judge failed to fully develop the record unpersuasive.

### 5. Fairness of Board's Procedures

Mekhoukh argues that the Board should have considered the new evidence he presented on appeal. We need not resolve this issue because even if the Board erred, its error was harmless. The evidence submitted by Mekhoukh to the Board, and included in the administrative record filed with this court on appeal, contains no information that materially affects the outcome of Mekhoukh's claims.

Mekhoukh also challenges the Board's decision to affirm without opinion. By regulation, the Board, acting through a single member, is authorized to affirm, without opinion, the result of the decision below, when a Board member determines that the result reached by the immigration judge was correct, that any errors in the decision were harmless or nonmaterial, and that either the issue is squarely controlled by precedent and does not involve a novel fact pattern, or that the factual and legal questions raised are so insubstantial that three-member review is not warranted. 8 C.F.R. §§ 1003.1(a)(7)(A)-(B), 1003.1(e)(4); see El Moraghy, 331 F.3d at 205-06. As a general matter, this court has upheld these streamlining regulations as a valid exercise of the Attorney General's discretion to fashion its own rules of procedure. Id. at 206 (citing Albathani, 318 F.3d at 377). With respect to the

application of the streamlining procedure to this particular case, we have reviewed the merits of the IJ's decision and found no reversible error. Accordingly, whether this case was appropriately streamlined is moot. Cf. El Moraghy, 331 F.3d at 206 ("We need not address the question of whether the decision to streamline this case was proper, because our review of the IJ's decision necessitates a remand to the BIA for further proceedings.").

## C.        Withholding of Removal

An alien seeking withholding of removal bears the burden of proving that his or her "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. § 208.16(b). An alien who fails to satisfy the asylum standard automatically fails to satisfy the more stringent test for withholding of removal. See Guzman v. INS, 327 F.3d at 16; Alvarez-Flores, 909 F.2d at 5. Accordingly, Mekhoukh's application for withholding of removal was properly denied.

## D.        Convention Against Torture

Mekhoukh's final claim is that he is eligible for withholding of removal under the United Nations Convention Against Torture.[15] In order to obtain protection thereunder, Mekhoukh bore

---

[15]The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, was implemented in the United States by the Foreign Affairs and

the burden of proving "that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1). The immigration judge concluded that the evidence did not support Mekhoukh's claim for protection under the Convention against Torture, and we agree. The record lacks any persuasive, much less compelling, evidence that it is more likely than not that Mekhoukh would be tortured upon his return to Algeria. Indeed, Mekhoukh himself did not even testify that he feared torture, as defined above. Accordingly, the immigration judge did not err in denying relief under the Convention Against Torture.

---

Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-761 (codified at 8 U.S.C. § 1231 (2000)). Article 3 prohibits states from returning individuals to other states where there are substantial grounds for believing they would be subject to torture.

The petition for review is <u>denied</u>.