# United States Court of Appeals
## For the First Circuit

No. 07-2732

JAN-VINICIUS ALEXANDRESCU, LUMINITA ALEXANDRESCU,
BOGDAN ALEXANDRESCU,

Petitioners,

v.

MICHAEL B. MUKASEY, ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Torruella and Boudin, Circuit Judges.

Patrick D. O'Neill, Jason P. Ramos, and O'Neill & Gilmore,
P.S.C. on brief for petitioner.
Erica B. Miles, Attorney, Office of Immigration Litigation,
Janice K. Redfern, Attorney, Office of Immigration Litigation, and
Jeffrey S. Bucholtz, Acting Assistant Attorney General, Department
of Justice, on brief for respondent.

August 7, 2008

**LYNCH**, **Chief Judge**.  Jan-Vinicius Alexandrescu ("Alexandrescu") is a citizen and native of Romania, as are his wife Luminita Alexandrescu ("Luminita") and son Bogdan Alexandrescu.  Alexandrescu petitions this court for review of the denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  An immigration judge ("IJ") denied the application but granted voluntary departure, and the Board of Immigration Appeals ("BIA") affirmed.  We deny the petition for review.

## I.

Alexandrescu first entered the United States in January 1993 on a crewman's visa while working on a cruise ship.  He stayed past the visa's expiration in February 1993 and filed an application for asylum in May 1993, listing his wife and son as derivative applicants.  His wife came to the United States on a visitor's visa in June 1993, which expired in December 1993.  Their son did not arrive in the United States until June 1994; he also entered on a visitor's visa, which expired in December 1994.  All overstayed.

The U.S. Department of Homeland Security issued Notices to Appear to each family member on December 1, 2005.  At a preliminary hearing before an IJ on March 14, 2006, they conceded their removability. On June 6, 2006, Alexandrescu filed an updated asylum application, again listing his family as derivative

applicants. We summarize Alexandrescu's statement in his asylum application and the testimony received by the IJ on October 30, 2006.

Alexandrescu graduated as a lieutenant from the Romanian military's Air Force Academy and flew MIG-16s from 1982 to 1984. He was then assigned to fly more advanced aircraft in an elite squadron, in which he remained until he was transferred to the reserves in 1990.

As a military officer, Alexandrescu was required to join the Communist Party and to espouse the party's ideology, even though he privately disagreed with it. At a high-level Communist Party meeting in 1987, he complained that the emphasis on politics and ideology in the Air Force was preventing sufficient training and resulting in unnecessary accidents. After a superior warned him that such statements could hurt his career, he recanted them.

Alexandrescu met Luminita in 1988. She lived in Macesti, a village near the Yugoslav border, and is of Yugoslav descent. To leave his base and visit her, Alexandrescu needed the permission of his superiors; they granted the requests even though they were uneasy because the Yugoslav border was a high-traffic avenue for escape from Romania.

That December, Alexandrescu requested permission to marry Luminita. His superiors warned him against the marriage because of her Yugoslav descent, yet he was granted the necessary permission.

Shortly thereafter, he was again called before the base's Communist Party Secretary, Gheorge Pasc, and the base's intelligence officer, Ion Rusu; they interrogated him about his marriage and asked him to divorce his wife because of her ethnic origin, but he refused.

That same day, Alexandrescu was told he would not fly again until further notice, and for the next six months he claims he "suffer[ed] the persecutions" of his superiors. He had to report on his daily activities, and he concluded that his telephone was bugged and his mail checked by the Securitate (the Romanian secret police). For example, when his mother received a phone call in April 1989 from her brother (who had emigrated legally to West Germany) wishing her a happy Easter, then a prohibited holiday in Romania, Alexandrescu was summoned to Rusu's office to explain the call and answer questions about his uncle. In September 1989, his mother sought permission to travel to West Germany to visit this same brother; Alexandrescu testified that if he had not been an officer in the Air Force and had not signed for her as a sort of guarantor, she would never have been allowed to leave the country. He also testified that she left and returned without further difficulties.

During this time he was also tasked with manual labor that he considered beneath his "quality as an officer," including agricultural work and cleaning toilets. Alexandrescu felt that this "denigrate[d" his "rank and . . . position" and made him an

"inferior human being."  However, in June 1989, he was allowed to resume his flight duties.

In October 1989, Alexandrescu was told that he would be moved to the Air Force reserves "through the back door," which meant that he would not be eligible for "qualified positions" (professional placements) in civilian life.  Around the same time, Alexandrescu raised the training issue again at a big party meeting.  Pasc, the Communist Party representative on the base, told him that his remarks at the party meeting "signed [the] decision" to move him into the reserves and that in civilian life, Alexandrescu would "not be more than a Garbage Man."

Alexandrescu remained in the Air Force's employ, however, during the Romanian democratic revolution from December 1989 to March 1990.  He claims his formal transfer to the reserves in April 1990 occurred shortly after he spoke out again about inadequate training.  As for why the government would wish to keep him in the reserves if it was so displeased with his criticisms, Alexandrescu surmised that the military had invested millions of dollars in his training and that by keeping him "next to them" they could "persecute [him] more for what [he] did in the past."

In civilian life, Alexandrescu obtained a commercial pilot license and a job with the government-run airline.  That job was short-lived, an outcome which Alexandrescu blames on Pasc, who had become the human resources office manager for the airline: when

Alexandrescu was forced to resign, Pasc told Alexandrescu that because Alexandrescu had been unwilling to support the old regime during the revolution, he would "suffer for the rest of [his] life even in Democratic Romania." The government-issued commercial pilot's license, however, was never revoked.

Alexandrescu testified that he "was surprised in the beginning how easy [he] got the [government airline] job knowing [his] record." He could not explain why he was hired and allowed to work without harassment for the first few months if his record was indeed ruined, guessing that maybe it was because Romania was a "free country now and more democratic," or because "they play[ed] a game," or because he was only flying domestic, not international, flights.

Between 1991 and 1993, Luminita worked for an independent newspaper opposed to the administration, which was still controlled by former Communist Party members. Meanwhile Alexandrescu worked odd jobs as a security guard. Alexandrescu's last job in Romania was with Air Antares, a new private airline.

In January 1993, Alexandrescu took a job as a waiter with a cruise line and freely left Romania on a Romanian passport. Alexandrescu considered returning to Romania in April 1993 after his father-in-law's death, but Luminita begged him not to return because people whom she assumed were associated with the military had contacted her about his whereabouts and she feared for his

safety.  He testified that as a member of the reserves, he is required to report any changes in address to the military, which he has not done.  He also claimed that these visitors had told his wife they knew he had applied for political asylum in the United States, even though that knowledge would appear to predate his actual application.

He fears now that on return to Romania, he will be prosecuted for failing to report his whereabouts to the military, which would result in his imprisonment.  He testified that his parents told him that people from the military had come by their house in 2003 or 2004 looking for him, though he had not asked them to send a corroborating letter to the court and he had not mentioned this fact in his revised asylum application.

The IJ issued her oral decision on October 30, 2006.  The IJ found no persecution in this case and enumerated many inadequately explained and uncorroborated elements of Alexandrescu's story.  The IJ also concluded that Alexandrescu had totally failed to establish a well-founded fear of future persecution, noting that it was unclear who the feared persecutor was and why, fifteen years later in a democratic Romania, the same people would be willing and able to persecute him if he returned.  On appeal, the BIA affirmed, emphasizing that Alexandrescu had not alleged events amounting to persecution.  This petition followed.

We start with Alexandrescu's asylum claim. To establish his eligibility for asylum, Alexandrescu must establish that he either suffered past persecution (which creates a rebuttable presumption of future persecution) or has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b). We must accept the administrative findings of fact "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). "When the BIA adopts the IJ's opinion and discusses some of the bases for the IJ's decision, we have authority to review both the IJ's and the BIA's opinions." Ouk v. Gonzales, 464 F.3d 108, 110 (1st Cir. 2006). The BIA's and IJ's conclusion that Alexandrescu suffered no persecution is amply supported by the record.

Assuming without deciding that all other considerations are resolved in petitioner's favor -- that his complaints about insufficient training constituted political speech and were the cause of his poor treatment, that his testimony was credible and fully corroborated, and that asylum can be granted on the basis of economic persecution -- Alexandrescu simply has not alleged conduct severe enough to constitute persecution. There is no serious economic deprivation here: Alexandrescu lost his job, not his ability to make a living. See Khalil v. Ashcroft, 337 F.3d 50, 53, 55 (1st Cir. 2003) (denying petition where asylum applicant

described economic hardship not amounting to persecution); see also, e.g., Zhuang v. Gonzales, 471 F.3d 884, 890 (8th Cir. 2006) ("Fears of economic hardship or lack of opportunity do not establish a well-founded fear of persecution."); Musabelliu v. Gonzales, 442 F.3d 991, 994 (7th Cir. 2006) (denying asylum where applicant was discharged from military for opposing corruption because "[l]osing a job is not persecution" and "[a]sylum is not a form of unemployment compensation"). Further, as both the BIA and the IJ emphasized, Alexandrescu was granted permission for his every request: to visit and then marry Luminita despite her ethnic background, to allow his mother to travel to West Germany, and to leave Romania to work abroad on a cruise ship.

Because Alexandrescu has failed to establish past persecution, he does not benefit from a presumption of future persecution and must offer specific proof that his fear of future persecution is well-founded. 8 C.F.R. § 208.13(b)(1). He argues that he will face legal prosecution and imprisonment upon return because he has failed to inform the military of his whereabouts and will thus be considered a deserter. Generally, a sovereign nation's normal penalties for avoiding military service are not considered persecution. Mekhoukh v. Ashcroft, 358 F.3d 118, 126 (1st Cir. 2004). While there are some exceptions to this general rule of thumb, none of them apply here. See id. Further, Alexandrescu has provided no information about the current

practices of the Romanian military, making it impossible to tell whether he would be punished for not reporting his movements, especially as he has never been called up for duty. Cf. Mojsilovic v. INS, 156 F.3d 743, 747-48 (7th Cir. 1998) (finding no well-founded fear of persecution where asylum applicant failed to demonstrate that he would in fact be punished for refusing to serve in Yugoslav army).

Nor has he clarified who would seek to persecute him on a protected ground: not only could he provide no specifics regarding which of his former alleged persecutors still hold positions of power, but he also failed to explain how punishment for disobeying a military law could be connected to his political views. See Foroglou v. INS, 170 F.3d 68, 71 (1st Cir. 1999) (punishment for refusing to serve in a military is generally not persecution on account of membership in a protected group).

Because the standard for withholding of removal is more difficult to meet than the asylum standard, Alexandrescu's failure to satisfy the asylum standard means that his withholding of removal claim must also fail. Khalil, 337 F.3d at 56. We also deny the petition as to the CAT claim because Alexandrescu has not alleged any past or potential future treatment that could possibly be considered torture.

The petition is denied.