[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 5, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-11605

_____

Agency No. A97-458-215

HAMED MOHAMMED,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(November 5, 2008)**

Before WILSON, PRYOR and COX, Circuit Judges.

PRYOR, Circuit Judge:

The key question presented by this petition is whether an applicant for

asylum whose testimony about past persecution is incredible and who, by his own

admission, lived peaceably for three years after his military service before his

arrival in the United States conclusively proved a well-founded fear of future persecution by presenting evidence that some other persons have been forcibly conscripted and tortured in his native country. Hamed Mohammed, a native and citizen of Eritrea, petitions for review of the denial of his application for asylum and withholding of removal by the Board of Immigration Appeals. The Immigration Judge found that Mohammed's testimony about past persecution in the Eritrean military was incredible because it contained inconsistencies and implausibilities and was not corroborated by reliable evidence. The Immigration Judge also found that Mohammed did not have a well-founded fear of persecution because it is undisputed that Mohammed was not persecuted during the three years that he lived and worked in Eritrea after he finished his military service. The Board affirmed. Because substantial evidence supports the findings of the Immigration Judge and the Board, we deny Mohammed's petition.

## I. BACKGROUND

In April 2005, Mohammed arrived in the United States as a stowaway aboard a cargo ship. An asylum officer conducted a credible-fear interview, and Mohammed alleged past persecution and fear of future persecution by the Eritrean military. The asylum officer referred Mohammed to an Immigration Judge to determine his eligibility for asylum. In July 2005, Mohammed filed his application

for asylum, 8 U.S.C. § 1158(a)(1), withholding of removal, id. § 1231(b)(3), and relief under the Convention Against Torture, 8 C.F.R. § 208.16(c)(2).

Mohammed alleged that he was conscripted into the Eritrean military in 1999, when he was in the seventh grade. He alleged that he was tortured on three occasions because he was suspected of planning to desert. He alleged that soldiers tied his hands behind his back, hung him from a tree by his hands, and beat him in front of other men. On another occasion, soldiers allegedly tied his feet and arms together and placed him in "the 8" position, chest-down on the ground, for an hour a day during the hottest part of the day for four or five days. On a third occasion, soldiers allegedly beat him with a stick on his leg. Mohammed also alleged that the military suppressed his religion by refusing to allow him "to do his prayers." Mohammed stated that he escaped from the military "at the end of 2001" and hid in Massawa. Mohammed stated that he had "no doubt at all" that if he went back to Eritrea, he would lose his life. Mohammed included with his application news articles and publications regarding Eritrea and human rights abuses there.

In October 2005, Mohammed filed a memorandum in support of his application. Mohammed's filing included the country profile for Eritrea published by the State Department, more news articles, and reports from private organizations regarding human rights abuses in Eritrea. The memorandum also contained new allegations of abuse. Mohammed described an incident in which

3

the military tied his body in "the 8" position and beat him for an hour a day for two weeks after he disobeyed an order to arrest the elderly mother of a military deserter. Mohammed also alleged that while he was in the United States, he learned that the military had visited his parents' house to search for him. He alleged that the military detained and beat his father.

In April and May 2006, Mohammed filed three submissions of additional evidence to support his application. The first submission included letters to Mohammed from his brother and father, a photograph of Mohammed, and copies of personal identification cards issued to him by his school, the Massawa Port, a national students' organization, and the Eritrean government. The letter allegedly written by his brother described the detention of Mohammed's father and referred to Mohammed as the writer's son. The identification cards bore his true name and photograph but stated different dates of birth. The second submission included background information on Eritrea from the State Department and an affidavit and book chapter from Professor Dan Connell. The third submission included a medical report dated May 3, 2006, by Dr. Sudha Reddy of Atlanta, Georgia, that described scars on Mohammed's back and injuries to his rotator cuffs. In the patient history section, the medical report included Mohammed's assertion about the cause of his injuries.

4

On August 16, 2006, Mohammed and his counsel appeared for a hearing before the Immigration Judge. Mohammed testified that he was taken from his school in 1999 when he was in the seventh grade and forced to serve in the Eritrean military. He testified that his responsibilities included harvesting crops and standing watch for enemies. He testified that soldiers beat him while his body was tied in "the 8" position for an hour a day for two weeks after he disobeyed an order to arrest the elderly mother of a military deserter. He testified that he was physically abused by members of the military on three occasions because he was suspected of planning to desert and because he worked slowly.

Mohammed testified that "toward the end of 2001" he escaped from the military. After his supervisor had left the base and while other officers slept, Mohammed placed his weapon under his mattress, walked off the base, and traveled by bus to the home of his family in Massawa. He stated that he spent "two to three months" with his family before he obtained a government-issued identification card to find a job. Mohammed stated that the military did not look for him at the home of his family during this time.

Mohammed testified that he secured a job as a crane operator at the port in Massawa, which was owned by the government. Mohammed testified that he moved into a house that he shared with other crane operators, reenrolled in the school from which he had been conscripted by the military, occasionally went into

5

town, and visited his relatives at least once every two weeks. Mohammed testified that, during this period, the military conducted at the port monthly "roundups" of those who deserted or evaded military service and he was able to hide from the authorities in the crane or in ships or containers at the port. Mohammed testified that he worked at the port for approximately three years before leaving for the United States. Mohammed also testified that, after he left Eritrea, his father was beaten by the Eritrean military and his brothers were conscripted.

Mohammed offered explanations for the discrepancies in his prehearing submissions. He testified that the four identification cards stated different birth dates because he gave false birth dates to the authorities to prevent the military from locating him. He testified that the letter allegedly written by his brother, which described the detention of their father and referred to Mohammed as the writer's son, explained what happened to their father from their father's perspective. Mohammed also submitted information about human rights abuses in Eritrea in reports published by the government of the United Kingdom, and an additional report about abuses in Eritrea published by the State Department.

On cross-examination, Mohammed testified that he waited approximately one month after arriving at his parents' home before he obtained his identification card and began to look for a job. In response to questions about this delay, Mohammed testified that he waited to apply for the card to spend time with his

6

family and to determine whether the military would attempt to follow him. He stated that when he "found out that they were not going to [he] decided to go get the ID card." In response to questions about his alleged inability to practice his Muslim faith in the military, Mohammed testified that he was never punished on the basis of his religion because he "was not really at the age where [he] worshipped." Finally, when asked to give the "urgent reason" he left Eritrea, Mohammed testified that "it's a country where human rights is not respected" and that he "had to flee to save [his] life."

The Immigration Judge found that Mohammed's testimony was not credible because there were inconsistencies between Mohammed's oral and written statements, his testimony was implausible, and the documentary evidence did not corroborate his testimony. The Immigration Judge explained that Mohammed failed to mention in either his credible-fear interview or his asylum application the incident when he allegedly was placed in "the 8" position and beaten after refusing to detain the elderly woman. The Immigration Judge found that the notes from the credible-fear interview did not mention any incident in which Mohammed alleged that he was punished for failing to obey an order with which he disagreed. The Immigration Judge also found inconsistencies regarding Mohammed's ability to practice his religion in the military. In his asylum application, Mohammed stated that he was "not allowed to do [his] prayers," but at his hearing, Mohammed

testified that he did not practice his religion while he was in the military. Mohammed testified that he was not at the age where he was worshiping and that he was never punished on the basis of his religion. The Immigration Judge found implausible Mohammed's contention that he was under constant surveillance as a possible deserter because Mohammed testified that he escaped by walking away from his barracks and boarding a bus on the street. The Immigration Judge also found implausible Mohammed's allegation that, after he escaped the military, he immediately returned to his hometown, where he had been conscripted. The Immigration Judge found implausible Mohammed's allegation that the military was actively searching for him while he was in "hiding" in Massawa because Mohammed openly worked for the government at the port and applied in person for a government identification card. The Immigration Judge found that Mohammed's explanation for the disparate birth years on his identification cards "defies credulity." The Immigration Judge found that Mohammed's testimony suggested that, although the military may have engaged in random roundups, it had not singled out and actively searched for Mohammed.

In addition to making an adverse credibility determination, the Immigration Judge found that Mohammed had not provided other credible evidence that he had been persecuted on account of his religion or political opinion. The letter allegedly written by Mohammed's brother referred to Mohammed as the author's son, and

the letter allegedly written by Mohammed's father stated that the father had been jailed and released, not beaten, after Mohammed left Eritrea. The medical report Mohammed submitted did not provide any medical evidence of how Mohammed's rotator cuffs were injured. The Immigration Judge also found that the identification cards Mohammed submitted were unreliable because Mohammed admitted that the cards contained false information.

Because the Immigration Judge found that Mohammed had not proved that he was persecuted in the past, the Immigration Judge did not presume that Mohammed had a well-founded fear of persecution in the future. See 8 C.F.R. § 1208.13(b)(1). The Immigration Judge found that Mohammed had not proved a well-founded fear of future persecution because Mohammed failed to establish a reasonable probability that he would have to serve in the military if he returned to Eritrea.

The Immigration Judge denied Mohammed's application for asylum and withholding of removal. Mohammed appealed to the Board of Immigration Appeals, which dismissed the appeal. The Board found that the inconsistencies, discrepancies, and implausibilities in Mohammed's testimony and evidence supported the adverse credibility finding and denial of asylum and withholding of removal by the Immigration Judge.

## II. STANDARD OF REVIEW

9

We review the decision of the Board, <u>Reyes-Sanchez v. U.S. Att'y Gen.</u>, 369 F.3d 1239, 1242 (11th Cir. 2004), and we review the decision of the Immigration Judge to the extent that the Board expressly adopted the opinion of the Immigration Judge. <u>Savoury v. U.S. Att'y Gen.</u>, 449 F.3d 1307, 1312 (11th Cir. 2006); <u>Al Najjar v. Ashcroft</u>, 257 F.3d 1262, 1284 (11th Cir. 2001). Because the Board agreed with the adverse credibility determination and the findings that Mohammed did not suffer past persecution, we review the decisions of both the Immigration Judge and the Board regarding those findings. <u>See Al Najjar</u>, 257 F.3d at 1284. Because the Board did not comment on the decision of the Immigration Judge regarding Mohammed's alleged fear of future persecution, we review the findings of the Immigration Judge about that issue.

We review factual findings, including credibility determinations, under the substantial evidence test. <u>Forgue v. U.S. Att'y Gen.</u>, 401 F.3d 1282, 1286 (11th Cir. 2005). We "affirm [the decision of the Board] if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." <u>Al Najjar</u>, 257 F.3d at 1284 (internal quotation marks omitted). The REAL ID Act provides that a trier of fact may base an adverse credibility determination on the inherent implausibility of an applicant's testimony, the inconsistency of his testimony with other evidence, or the internal inconsistency of his testimony, regardless of whether any implausibilities or inconsistencies go to the heart of the

applicant's allegations of past persecution or fear of future persecution. Pub. L. No. 109-13, 119 Stat. 231, 303 (codified at 8 U.S.C. § 1158(b)(1)(B)(iii)).

Our standard is highly deferential. Because the Immigration Judge made an adverse credibility determination, "the burden is on the applicant alien to show that the . . . credibility decision [of the Immigration Judge] was not supported by specific, cogent reasons or was not based on substantial evidence." Forgue, 401 F.3d at 1287 (internal quotation marks omitted). "[W]e review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004). We may reverse a finding of fact "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Id.; see also 8 U.S.C. § 1252(b)(4)(B) ("[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary[.]"). We "may not substitute [our] judgment for that of the [Board] with respect to credibility findings." D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004).

### III. DISCUSSION

To establish asylum eligibility, an applicant must prove that he is a "refugee" under the Immigration and Nationality Act. See 8 U.S.C. § 1158(b)(1); see also Al Najjar, 257 F.3d at 1284. A "refugee" must either have suffered persecution or have a well-founded fear of future persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To establish that he has suffered past persecution, an applicant must "prove (1) that []he was persecuted, and (2) that the persecution was on account of a protected ground." Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1236 (11th Cir. 2006). To establish a well-founded fear of future persecution, an applicant must "present detailed, specific facts showing a good reason to fear that he . . . will be singled out for persecution on account of such opinion." Al Najjar, 257 F.3d at 1287 (quoting Faddoul v. INS, 37 F.3d 185, 188 (5th Cir. 1994)) (internal quotation marks omitted). An applicant may be able to meet his statutory burden by providing uncorroborated but credible testimony, and in the absence of corroborating evidence, an adverse credibility determination may be sufficient to support the denial of an application. See 8 C.F.R. § 208.13; see also Forgue, 401 F.3d at 1287; D-Muhumed, 388 F.3d at 819. An applicant who cannot meet the standard for asylum cannot meet the standard for withholding of removal. D-Muhumed, 388 F.3d at 819; see also Al Najjar, 257 F.3d at 1292–93.

We address Mohammed's petition in two parts. First, we discuss whether substantial evidence supports the finding that Mohammed failed to prove past persecution. Second, we discuss whether substantial evidence supports the finding that Mohammed failed to prove a well-founded fear of future persecution.

*A. Substantial Evidence Supports the Finding That Mohammed Failed To Prove Past Persecution.*

The record does not compel a finding that Mohammed suffered past persecution. Extensive evidence supports the adverse credibility determination of the Immigration Judge and the Board, and substantial evidence supports the finding that Mohammed's other evidence was unreliable.

Numerous inconsistencies and implausibilities in Mohammed's testimony regarding past persecution taint both his account of his service in the military and his description of his experiences in Eritrea after he left the military. Mohammed testified that he was punished after he refused to arrest the elderly mother of a deserter, but he did not mention this incident or any other incident in which he was punished for disobeying an order in either his credible-fear interview or asylum application. Mohammed alleged that he was under constant surveillance while in the military, but he also alleged that he left the military by walking away from his barracks and using public transportation to travel to the home of his family. Mohammed stated in his application that the military did not allow him to practice

13

his religion, but he testified at his hearing that he was never punished on the basis of his religion. Mohammed testified that, after he deserted the military in 2001, soldiers constantly searched for him and he was forced to go into hiding, but he also testified that he lived with his parents without incident for about three months after his desertion; obtained employment in a government-owned port; lived at the port without incident for three years; obtained in person a government-issued identification card; returned to the same school from which he had been conscripted; and visited his family at least every two weeks. We conclude, and the dissent agrees, that substantial evidence supports the finding of the Immigration Judge and the Board that Mohammed's testimony was incredible.

Mohammed argues that his letters, medical report, and identification cards substantiate his claims of past persecution, but the record supports the finding of the Immigration Judge that this evidence is unreliable. The letter allegedly written by Mohammed's brother about the abuse of their father referred to Mohammed as the writer's son. Although Mohammed testified that his father was detained and beaten by the military after Mohammed left Eritrea, the letter allegedly written by his father does not mention any beating. Each of Mohammed's four identification cards bore a different date of birth, and Mohammed failed to offer a plausible explanation for the disparity. The medical report confirmed Mohammed's injuries

14

to his rotator cuffs and, in the patient history section, included Mohammed's assertion about the cause of his injuries.

*B. Substantial Evidence Supports the Finding That Mohammed Does Not Have a Well-Founded Fear of Persecution.*

The record also does not compel a finding that Mohammed presented "specific, detailed facts showing a good reason to fear that he . . . will be <u>singled out</u> for persecution. . . ." <u>Al Najjar</u>, 257 F.3d at 1287 (quoting <u>Faddoul</u>, 37 F.3d at 188) (internal quotation marks omitted). Mohammed submitted evidence that abuses of human rights occur in Eritrea, but that evidence is not specific to Mohammed. None of that evidence compels a finding that Mohammed has a well-founded fear that he will be singled out for persecution if he returns to Eritrea.

The dissent contends that Mohammed established a well-founded fear of persecution based on the reasonable possibility of forced service in the Eritrean military, but we disagree. Mohammed had to prove either that he would be disproportionately punished for refusing to serve in the Eritrean military or that he would be forced to join an internationally condemned military. <u>Mekoukh v. Ashcroft</u>, 358 F.3d 118, 126 (1st Cir. 2004). The likelihood of punishment for refusal to serve is just as essential to the latter burden of proof as it is to the former: "An alien's claim to asylum based on his objection to serving in an internationally condemned military requires proof that there is a reasonable possibility that the

15

alien will have to serve or be punished for refusing to serve." Id. at 127 (citing Mojsilovic v. INS, 156 F.3d 743, 747 (7th Cir. 1998)).

The dissent contends that Mohammed met both burdens of proof, but because the record does not compel a conclusion that Mohammed will have to serve in the Eritrean military if he returns to Eritrea, much less that he will be punished for failing to serve, Mohammed has met neither burden of proof. Substantial evidence supports the finding of the Immigration Judge that Mohammed failed to prove that he would be forced to join the military if he returned to Eritrea. Mohammed's evidence that the military has searched for him at the home of his family since his arrival in the United States is unreliable, and Mohammed's testimony about his experiences during the three years before he left Eritrea does not compel a finding that he will be conscripted if he returns. Before he left Eritrea, Mohammed, without incident, obtained a government-issued identification card, worked in a government-owned facility in his hometown, reenrolled in the school from which he had been conscripted, and regularly visited his family at their home. Viewed in the light most favorable to the decision of the Immigration Judge, the record supports a finding that Mohammed lived an open and peaceful life after his service in the military. The record does not compel a finding that Mohammed would be unable to return to a similar life.

16

The dissent contends that the Immigration Judge "made his determination solely on Mohammed's testimony, effectually punishing Mohammed for stories that the [Immigration Judge] deemed implausible and that, in the . . . mind [of the Immigration Judge], did not add up," but this accusation is unpersuasive. First, the accusation is incorrect. The Immigration Judge considered both Mohammed's testimony and his documentary evidence, and the Immigration Judge denied relief on the basis of both the adverse credibility determination and his finding that Mohammed had not offered any reliable corroborative evidence: "[T]here is no reliable evidence on the record to conclude that [Mohammed] deserted the army or refused conscription on account of his opinions or beliefs." Second, the accusation that the Immigration Judge denied relief on the basis of testimonial implausibilities identifies no defect in the decision of the Immigration Judge. The Immigration Judge was entitled to deny relief on the basis of internal inconsistencies and implausibilities in Mohammed's testimony. Although the Immigration Judge was obligated to consider Mohammed's documentary evidence, the Immigration Judge was under no obligation to credit it or assign it decisive weight. The regulations permit the Immigration Judge to deny relief upon finding that Mohammed failed to corroborate incredible testimony. "Th[e] language [in 8 C.F.R. § 208.13] plainly indicates that if the trier of fact either does not believe the applicant or does not know what to believe, the applicant's failure to corroborate his testimony can be

17

fatal to his asylum application." Sidhu v. INS, 220 F.3d 1085, 1090 (9th Cir. 2000).

The dissent also contends that the Immigration Judge engaged in "personal speculation," "idle musings," "guesswork" and "supposition[s]" about the likelihood that Mohammed would be conscripted upon return to Eritrea, but these allegations misconstrue the findings of the Immigration Judge. The Immigration Judge found that Mohammed may have been released from the military and that he is unlikely to be conscripted upon return to Eritrea directly on the basis of Mohammed's own testimony. In the light of Mohammed's various admissions that, after he left the military, he lived with his family, applied for and received and worked a government job, reenrolled in school, later lived in government housing, and regularly visited his family, all without incident, the finding of the Immigration Judge that Mohammed would not likely face continued military service upon return to Eritrea cannot be described fairly as a "theory."

The dissent contends that it is "fundamentally unfair" for us to rely on Mohammed's various admissions to affirm the finding of the Immigration Judge because we credit testimony that we have found incredible, but this argument misses the mark. The law permits a trier of fact to base an adverse credibility determination on internal inconsistencies in an applicant's testimony, 8 U.S.C. § 1158(b)(1)(B)(iii), and the point of an internal inconsistency is that the trier may

18

believe one part of an applicant's story and not believe others. The Immigration Judge and the Board are entitled to credit some parts of Mohammed's testimony and to discredit others.

The dissent also contends that Mohammed's evidence of abuses of others in Eritrea compels a finding that he will be conscripted or punished upon his return, but the Immigration Judge and the Board assigned greater weight to the substantial testimonial and documentary evidence that was specific to Mohammed. Regardless of whatever persecution others have suffered, we know that Mohammed was not recalled into service or persecuted in the three years he remained in Eritrea after he left the military. Mohammed admitted it, and the Immigration Judge was entitled to rely on that admission. The Immigration Judge was also entitled to find that the evidence that the military has searched for Mohammed since he left Eritrea is unreliable.

The dissent places decisive weight on objective evidence in the record, but we cannot undertake a de novo review. "Whether we, like the dissent, would have made different findings, if faced with [Mohammed's] application for asylum and live testimony, is irrelevant." Silva, 448 F.3d at 1243. Our standard of review is based on the understanding that "the Immigration Judge is in a superior position to make findings of fact." Id. at 1242.

19

The dissent also objects that requiring Mohammed to prove that he will be singled out for persecution if he returns to Eritrea "neglects to appreciate" that some groups may be systematically persecuted on the basis of their religion or political opinions and "fails to engage in [the] weighing that the complex relationship between group and individual targeting requires[,]" but again, the law does not permit the approach the dissent suggests. The law provides that Mohammed bore the burden of proving his fear of future persecution. Al Najjar, 257 F.3d at 1287. Our review is limited to deciding whether the evidence, viewed in the light most favorable to the Immigration Judge, compels a reversal. Adefemi, 386 F.3d at 1027. Evidence of group membership, standing alone, cannot compel a finding of a well-founded fear of persecution when the record contains ample evidence to support the contrary finding by the Immigration Judge.

## IV. CONCLUSION

Mohammed's petition for review is denied.

**PETITION DENIED.**

WILSON, Circuit Judge, dissenting:

The majority in effect punishes Mohammed for testimony the Immigration Judge (IJ) deemed incredible. I cannot subscribe to the majority's reasoning. Even without relying on Mohammed's testimony, there is sufficient objective evidence of Eritrea's human rights record and serious abuses to support Mohammed's claim that he will be persecuted if he is returned to Eritrea. At the very least, I would vacate the BIA's decision and remand to the agency for consideration of the other compelling objective evidence presented by Mohammed in support of his petition.

## I. BACKGROUND

Mohammed entered the United States on April 15, 2005, as a stowaway. Upon his arrival, Mohammed requested asylum and withholding of removal. In his credible fear interview, he stated that he was forcibly recruited into the Eritrean military in 1999. While serving, Mohammed claims that the military suspected him as a potential deserter, tied him to a tree, and beat him. He stated that he escaped from the military in 2001 and that he fears harm should he return to Eritrea because of his desertion and refusal to serve in the army.

In July 2005, Mohammed filed an application for asylum and withholding of removal under the Immigration and Nationality Act (INA) and Convention Against Torture Act (CAT) based on political opinion persecution and a threat of torture. Mohammed states that he was forcibly recruited into the Eritrean military in

seventh grade. He describes incidents of physical abuse at the hands of the military, including (1) being hung from a tree with his arms tied behind his back and beaten; (2) having his arms and feet tied together behind his back for an hour each day for several days; and (3) being beaten on his leg with a stick.

Mohammed also attached to his application various articles and reports on Eritrea. An Amnesty International press release confirms that all citizens between the ages of 18 to 40 are conscripted into the Eritrean military for an indefinite period of time. Several reports state that military conscripts, evaders, and deserters were arbitrarily detained, tied up in various positions, and routinely tortured. Another report indicates that applying for asylum abroad is seen as an act of disloyalty to the Eritrean government, for which an applicant, if relief is denied, may be detained and tortured.

Three months after filing his asylum application, Mohammed filed a supplemental affidavit repeating several of the events in the asylum application and adding the following. Mohammed states that he was forced by the military to detain an old woman because her son was a military deserter. When he saw the old woman, he claims he could not bring himself to arrest her. As a result, Mohammad says he was detained by officers for two weeks, during which time he was tied up and beaten. Mohammed also states that after he escaped from the military in 2001, he went into hiding in the port town of Massawa, where he stayed until hiding

22

aboard a ship bound for America in 2005. He asserts that, because he left Eritrea, his father was arrested, detained for three weeks, and badly beaten. Mohammed expresses his fears: "If I go back to Eritrea, I have no doubt I will be killed."

Mohammed submitted several documents to support his application: (1) two letters to Mohammed, allegedly from his brother and his father; (2) a photograph of Mohammed and two other soldiers in military uniform; and (3) copies of several identification cards with conflicting birth dates. The first letter, purporting to be from Mohammed's brother, describes someone coming to the house asking about Mohammed. The letter was translated into English, and midway through, the writer's perspective changes from that of Mohammed's brother to that of his father. The letter reads, in part:

> They came for [you] a second time, grabbed me, and asked me, "Where is your son?" . . . . They told me that I should either bring my son or go to jail. I replied, saying, 'Where do you want me to bring him from, I don't know where he is, so I cannot tell you where he is. Do what you have to do.' They took him and jailed him for three days . . . and he came back to us with his head swollen.

The second letter, from Mohammed's father, states, in part, that Mohammed's father was accused of "making you, my son, flee the country" and was jailed for three weeks and forced to pay a fine.

Mohammed also submitted numerous articles on the conditions in Eritrea, a 2005 Country Report on Eritrea from the Bureau of Democracy, Human Rights,

23

and Labor, and an affidavit from an expert on the conditions in Eritrea. The affiant states that government officials in Eritrea carefully monitor draft-aged youths and, based on Mohammed's account of his experiences, Mohammed would be singled out due to his desertion from the army and would be almost certainly subject to "official detention and physical violence." He goes on to state that Mohammed's "personal history and his flight to the U.S. will be well-known to the authorities there [and if] he arrived in Eritrea, government agents accessing his records would immediately impute him as an Eritrean dissident and detain him."

The Country Report confirms that Eritrean draft-evaders have been tortured, beaten, and killed. The Report states that deserters and draft-evaders have been subjected to punishments such as prolonged sun exposure, binding of the hands, elbows, and feet for extended periods of time, and suspension from trees with their arms tied behind their backs. The Report also confirms that the parents of military evaders have been arrested and detained. A chapter on Eritrea states that all Eritreans between the ages of 18 and 45 are required by law to serve 18 months of national service, and since 1998, have been kept in service on a continuous basis. Furthermore, the government engages in frequent, often brutal, house-to-house roundups to capture military evaders.

Lastly, Mohammed submitted a medical report from the Atlanta Department of Corrections stating that he had sustained rotator cuff injuries in both shoulders

24

and has numerous scars, including an "8-10cm area of heterogeneous scar tissue and bony abnormality" on his left leg. The report notes in its history section that an "[e]pisode of torture included long term injury to shoulders, bone infection and continued pain in left leg."

At Mohammed's asylum hearing, he recounted much of the above history, adding the following testimony. He testified that in late 2001 he escaped from the military compound while officers were sleeping. From 2002 to 2005, Mohammed went to school and worked as a crane operator for a private company at the port in Massawa. He testified that during this time the military would come and roundup groups of people to be forced into military service. He stated that he was able to successfully hide from the military during this time, sometimes receiving advanced warnings of the roundups. He hid from the authorities in the crane in which he worked or in ships or containers at the port.

The IJ issued a written decision, finding that Mohammed's testimony was not credible, due to inconsistent statements and inherent implausibilities. Agreeing with the IJ's adverse credibility determination, the BIA affirmed the IJ's denial of all relief "[i]nasmuch as the Immigration Judge considered all of the evidence of record in this case."

## II. DISCUSSION

### A. Mohammed's Testimony

25

As the majority noted, Mohammed has not met his burden of showing that the IJ's adverse credibility determination of his testimony was not based on substantial evidence. The BIA found inconsistencies in the record and implausibilities. Mohammed has not provided sufficient explanations for these inconsistences and implausibilities. Thus, I agree with the majority that the IJ and BIA did not err in making an adverse credibility determination and in disregarding Mohammed's testimony. *See Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1233 (11th Cir. 2006) (per curiam).

## B.    Objective Evidence

Nevertheless, even disregarding his testimony, Mohammed presents compelling evidence that he is entitled to asylum based on the remaining evidence in the record. To be eligible for asylum, Mohammed must establish that he is a "refugee" within the meaning of the INA. 8 U.S.C. § 1158(b)(1)(A). One way Mohammed can establish refugee status is by demonstrating a well-founded fear of future persecution on account of his "race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.13(b)(2); *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1006-07 (11th Cir. 2008). A well-founded fear of future persecution can be established by (1) past persecution on account of one of the protected grounds, which creates a presumption of a well-founded fear of future persecution; (2) a reasonable possibility of personal

persecution that cannot be avoided by relocating within the subject country; or (3) a pattern or practice in the subject country of persecuting members of a statutorily defined group of which the alien is a part. *See* 8 C.F.R. § 208.13(b)(1), (2). In order to be well-founded, an applicant's fear of persecution must be "subjectively genuine and objectively reasonable." *De Santamaria*, 525 F.3d at 1007.

While courts have not deemed it persecution for a country to require military service of its citizens, several courts have recognized that forced military recruitment may constitute persecution if the petitioner is refusing to join "a military whose acts are condemned by the international community as contrary to the basic rules of human conduct." *Mekhoukh v. Ashcroft*, 358 F.3d 118, 126 (1st Cir. 2004). *See also Kibinda v. Att'y Gen.*, 477 F.3d 113, 121 (3d Cir. 2007); *Islami v. Gonzales*, 412 F.3d 391, 396 (2d Cir. 2005); *Pelinkovic v. Ashcroft*, 366 F.3d 532, 538 (7th Cir. 2004); *M.A. v. INS*, 899 F.2d 304, 312 (4th Cir. 1990) (en banc); *Matter of A-G-*, 19 I. & N. Dec. 502, 506 (BIA 1987).

There are two exceptions to the general rule that compulsory military service does not provide asylum seekers with adequate cause to claim persecution. "First, an alien may be eligible for asylum if refusal to serve in the military results . . . in disproportionately severe punishment" and "[s]econd, an alien is eligible for asylum if the alien would be associated with a military whose acts are condemned by the international community. . . ." *Mekhoukh*, 358 F.3d at 126.

27

Mohammed demonstrated the elements of both claims. He presented substantial evidence that there is a reasonable possibility that he would have to serve in a military that commits human rights violations. Moreover, if he does not serve, he presented substantial evidence that he will receive disproportionately severe punishment. This substantial evidence compels a contrary finding to the IJ's. I will discuss each claim in turn.

1.      **Mohammed Would Be Forced to Join a Military Who Acts Are Condemned by the International Community**

To support a claim that he would be forced to join a "military whose acts are condemned by the international community as contrary to the basic rules of human conduct," Mohammed must show that (1) the Eritrean military has been condemned by the international community; (2) there is a reasonable possibility that Mohammed will be forced to serve in the Eritrean military upon return; and (3) he has a "genuine conscientious objection to service." *Mekhoukh*, 358 F.3d at 128.

a.      **The Eritrean Military Has Been Condemned by the International Community**

To support a claim that Mohammed would be forced to join a "military whose acts are condemned by the international community as contrary to the basic rules of human conduct," he must first show that the Eritrean military has been condemned by the international community. *Id.* at 128. The IJ correctly concluded

28

that the Eritrean military has been condemned by the international community for committing human rights abuses. The IJ relied on a United States State Department Report noting the Eritrean military's numerous human rights abuses. The Report confirmed that the Eritrean military engages "in torture and physical beatings of prisoners, particularly during interrogations" and that "during the year, security forces severely mistreated and beat army deserters, draft evaders, and members of particular social groups." Therefore, Mohammed successfully showed that the Eritrean military has been condemned by the international community. *See Mekhoukh*, 358 F.3d at 128.

> **b. There Is a Reasonable Possibility that Mohammed Will Be Forced to Serve in the Eritrean Military Upon Return**

To support a claim that Mohammed would be forced to join a "military whose acts are condemned by the international community as contrary to the basic rules of human conduct," he must next show that there is a reasonable possibility that he will be forced to serve in the Eritrean military upon return to Eritrea. *Mekhoukh*, 358 F.3d at 128. The IJ denied Mohammed relief based on its conclusion that Mohammed failed to show he would be forced to rejoin the military if he was returned to Eritrea. Without his testimony, the IJ reasoned, nothing established how Mohammed left the military—without Mohammed's testimony, the evidence does not show whether Mohammed deserted the military

29

or whether he was voluntarily discharged. Thus, the IJ held that Mohammed failed to establish a reasonable possibility that he would be forced to serve in the military if he returns to Eritrea. The critical issue, therefore, is whether substantial evidence supports the IJ's finding regarding the possibility of forced military service.

The IJ found that because Mohammed's testimony was incredible, his claim effectually failed. While it is true that "an adverse credibility determination alone *may* be sufficient to support the denial of an asylum application," an adverse credibility determination is not dispositive in some cases. *Forgue v. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005) (internal citations omitted) (emphasis added). "If the applicant produces no evidence other than his testimony, an adverse credibility determination is alone sufficient to support the denial of an asylum application." *Id.* This is not the case here. Indeed, Mohammed produced other significant evidence in addition to his testimony.

As we noted in *Forgue*, "[o]f course[] an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant." *Id.* The IJ "must still consider all evidence introduced by the applicant." *Id.* If "the applicant produces other evidence of persecution, whatever form it may take, the IJ must consider that evidence, and it is not sufficient for the IJ to rely solely on an adverse credibility determination in those instances." *Id.*

30

Here, the IJ's adverse credibility determination did not alleviate his duty to consider the other objective reports and evidence produced by Mohammed. Even though the IJ recognized that the Eritrean military has been condemned by the international community for committing human rights abuses, the IJ made his determination solely on Mohammed's testimony, effectually punishing Mohammed for stories that the IJ deemed implausible and that, in the IJ's mind, did not add up.

The IJ denied Mohammed asylum relief, finding that the "record fails to establish that there is a reasonable possibility that [Mohammed] will have to serve in the military if he returns to Eritrea." While the IJ found that the record established Mohammed's prior service in the army, he found that Mohammed had not demonstrated "how he left the army" or that he was a deserter. The IJ theorized that Mohammed may have been "simply released from his military service." If this were the case, he concluded, Mohammed would not likely face continued military service upon his return to Eritrea.

Considering the record as a whole, I conclude that the IJ's supposition that Mohammed may have simply been released from military service and, if so, would not likely face military service upon return, is not supported by "reasonable, substantial, and probative evidence." *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 818 (11th Cir. 2004) (quotations omitted). The objective articles and reports

Mohammed submitted maintain that the Eritrean military does not simply "release" conscripts from service, as the IJ supposed. On the contrary, the record establishes that those conscripted into the Eritrean military are kept in service indefinitely. While by law "[a]ll Eritreans between the ages of 18 and 45 are required . . . to perform 18 months of national service," in practice "conscripts have been kept in service on a continuous basis" since 1998. Military conscripts are generally not released from service but instead are kept in service indefinitely. The IJ's theories about military service in Eritrea "are little more than idle musings." *Don v. Gonzales*, 476 F.3d 738, 754 (9th Cir. 2007) (Wardlaw, J., dissenting). His personal speculation about how the Eritrean military operates is no substitute for substantial evidence. *Lopez-Reyes v. INS*, 79 F.3d 908, 912 (9th Cir. 1996). The substantial evidence points to a conclusion contrary to the IJ's.

Further, even if Mohammed *were* released, the IJ's theory that Mohammed would not likely face continued military service does not hold water. "Those who complete[] national service . . . are subject to recall and reserve duties." Moreover, "[r]e-induction for those who have already served has been used as political punishment for . . . [those] who have expressed public criticism of government policy." "There is no exception for conscientious objectors." So even if Mohammed were "simply released from his military service" as the IJ contemplated, he could be recalled. Again, the IJ's theory demonstrates that he

32

relied on guesswork about how a military operates and not on the substantial objective evidence before him.

The majority engages in much of the same speculation as the IJ does regarding forced military service and employs questionable logic. It finds that "substantial evidence supports the finding of the [IJ] that Mohammed failed to prove that he would be forced to join the military if he returned to Eritrea [because] Mohammed's evidence that the military has searched for him at the home of his family since his arrival in the United States is unreliable, and Mohammed's testimony about his experiences during the three years before he left Eritrea does not compel a finding that he will be conscripted if he returns." I disagree with the majority's approach.

First, the majority bolsters its contention that the record supports the IJ's finding that Mohammed would not likely face continued military service based on Mohammed's testimony that "[b]efore he left Eritrea, Mohammed, without incident, obtained a government-issued identification card, worked in a government-owned facility in his hometown, reenrolled in the school from which he had been conscripted, and regularly visited his family at their home." In doing this, the majority relies on the very testimony that the IJ deemed incredible. The IJ called it "inherently implausible" and felt "compel[led] . . . to find that [Mohammed] did not testify credibly." Yet Mohammed's incredible testimony

33

about his experiences during the three years before he left Eritrea are the basis of the majority's conclusion about forced military service.

Second, the majority cherry-picks evidence, disregarding Mohammed's testimony as incredible and yet simultaneously basing its conclusion on the very evidence it was quick to throw out. The IJ never made a finding that those particular parts of Mohammed's testimony were credible. If the majority would like to open up this box, I am happy to do so. But here, the majority is just having its cake and eating it too—refusing to believe Mohammed when doing so would support Mohammed's asylum application and selectively relying on Mohammed's testimony when it suits the majority, effectively punishing Mohammed for testimony the IJ deemed implausible. While the law does permit a trier of fact to credit some parts of Mohammed's testimony and discredit others, as the majority points out, I find this approach to be fundamentally unfair. Mohammed is penalized by his testimony either way—either it is incredible and thus cannot support his asylum application, or it is selectively used to support removing him. I cannot support such a methodology to well-founded fear determinations.

Should we look at Mohammed's testimony in its totality, examining the entire contents of the box that the majority has opened, it by no means supports the IJ's "finding that Mohammed lived an open and peaceful life after his service in the military." Mohammed did not testify that he "lived an open and peaceful life."

34

On the contrary, he testified that he spent three years in hiding in order to avoid military conscription. That Mohammed was able to avoid military conscription for three years does not support a contention that his life was "open and peaceful." The majority's ruminations on peaceful living in Eritrea are not compelling. *Cf. Don v. Gonzales*, 476 F.3d 738, 754-55 (9th Cir. 2007) (Wardlaw, J., dissenting) (finding the majority's and IJ's conjectures "little more than idle musings . . . [and] speculation and not a substitute for substantial evidence"). If the majority would like to give credence to Mohammed's testimony about living and working in Eritrea for three years, fairness requires a recognition of Mohammed's testimony that he was only able to do this because of his luck in hiding from the military. He would hide in the crane in which he worked or in ships or containers at the port. To say that Mohammed can return to an open life of peace begs the underlying issue that Mohammed was avoiding military conscription the entire time, which objective evidence makes clear will be a constant issue until Mohammed reaches the age of 40, at which time he would no longer be of military age. Mohammed has about 18 years of hiding to go. Sending an alien back so he may go into hiding from a military that commits human rights abuses seems a backward solution when the majority claims he is returning to "an open and peaceful life."

Third, not only do I find the majority's approach to be fundamentally unfair, but I find its approach to be illogical. The majority relies on testimony the IJ

35

deemed incredible only when its incredibility flies in the face of objective evidence in the record, and it relies on testimony deemed credible only when its credibility is at odds with objective evidence. The majority relies on the incredibility determination of Mohammed's testimony about hiding from military conscription, even though the objective evidence in the record consistently states that Eritreans of military age are kept in service indefinitely or are subject to recall on a continuous basis. Based on the objective evidence in the record, hiding seems one of the only ways to succeed at avoiding military conscription. Moreover, Mohammed's testimony that leads the majority to contend that he led "an open and peaceful life" is deemed credible, even though the objective evidence supports the opposite of an open and peaceful life. While the majority is correct that a "trier [of fact] may believe one part of an applicant's story and not believe others," this approach defies logic. It is backwards—the approach to determining credibility defies the objective evidence both ways.

The majority's musings on Eritrean life and the military are no more a substitute for substantial evidence than were the IJ's musings. Because objective evidence demonstrates that conscripts are generally kept in service continually and may be subject to recall at any time, the record compels a finding that Mohammed will have to serve in the military if he returns to Eritrea.

36

### c. Mohammed Has a Genuine Conscientious Objection to Service

To support a claim that Mohammed would be forced to join a "military whose acts are condemned by the international community as contrary to the basic rules of human conduct," he must lastly show that he has a "genuine conscientious objection to service." *Mekhoukh*, 358 F.3d at 128. Mohammed has a "genuine conscientious objection to service." This element requires little discussion. The IJ himself never disputed this. He instead explicitly recognized that "opposition to military conscription" is an "aspect of [Mohammed's] asylum application [that] appear[s] to be plausible in light of common logic and evidence."

### 2. Refusal to Serve in the Eritrean Military Results in Disproportionately Severe Punishment

Substantial objective evidence in the record supports that "[r]efusal to serve in the [Eritrean] military results not in normal draft evasion penalties, but rather in disproportionately severe punishment." *Mekhoukh*, 358 F.3d at 126. First, torture is used as "standard military punishment." The methods of torture are heinous. One of the various methods used is "the helicopter":

> [The victim is] tied with a rope by hands and feet behind the back, lying on the ground face down, outside in the hot sun, rain or freezing cold nights, stripped of upper garments. This is a punishment allocated for a particular number of days, the maximum reported being 55 days . . . but is more often

37

one or two weeks.  The prisoner is tied in this position 24 hours a day,
except for two or three short breaks for meals and toilet functions.

Another is the "Jesus Christ":

[The victim is] stripped to the waist, wrists tied, and standing on a block
with hands tied to a tree branch; the block is removed, leaving the victim
suspended with the feet just off the ground in a crucifix-like posture.
Beatings are inflicted on the bare back.  This is said to be an extremely
severe torture, restricted to only 10 to 15 minutes to avoid serious lasting
injury.

Another is known as the "number eight":

[I]nside a special torture room, the victim is tied by wrists behind the back
and with the feet bound; a stick is placed under the knees and supported on a
framework on both sides horizontally, and the body is turned upside down
with the feet exposed.  The soles of the feet are beaten with sticks or
whipped.

Those who attempt to evade military service, or who are even suspected of
evading, may be detained and tortured.  According to Amnesty International, "[t]he
penalty for evading conscription or protesting against military service is three
years' imprisonment, but in practice those caught are tortured and arbitrarily
detained for several months with hard labor, before being forced back into the
army."  For example, in November 2004, Eritrean security forces "indiscriminately
arrested thousands of people suspected of evading military conscription.  People
were arrested at places of work, in the street, at roadblocks and at home.  Prisoners
were taken to [an] . . . army prison . . . .  That night, . . . [s]oldiers opened fire and

38

shot dead at least a dozen prisoners and wounded many more." Further, "[m]any prisoners [are] kept in overcrowded metal shipping containers in unventilated, hot and unhygienic conditions and denied adequate food and medical treatment. Conditions in military prisons around the country [are] extremely harsh." The Country Report found that some who attempted to evade have been killed. The great "likelihood that [Mohammed] will be punished" for refusal to serve is beyond dispute. *See Mojsilovic*, 156 F.3d at 747 (quotation and citation omitted).

Accordingly, I conclude that Mohammed has established a well-founded fear of persecution based on forced service in a military condemned by the international community and that refusal to serve in the military results in disproportionately severe punishment. *See Mekhoukh*, 358 F.3d at 126. Mohammed is therefore entitled to asylum.

The majority finds that the evidence of human rights violations in Eritrea does not compel a finding that Mohammed has a well-founded fear of future persecution because he must present evidence "that he will be *singled out* for persecution." This reasoning neglects to appreciate "the complex relationship between group targeting and individual targeting." *Kotasz v. INS*, 31 F.3d 847, 854 (9th Cir. 1994). The Ninth Circuit has cautioned against use of the phrase "singled out" for this very reason—"it is not surprising that the BIA's reliance on phrases such as 'singling out' occasionally results in error. While such phrases

may be useful to denote the existence of a particularized threat of persecution is some circumstances, they are ill-suited to many others." *Id*.

The majority claims that "the law provides that Mohammed bore the burden of proving *his* fear of future persecution." I disagree. First, there are "situations in which members of an entire group . . . *are* systematically persecuted. In such cases, group membership itself subjects the alien to a reasonable possibility of persecution," so that he can satisfy the well-founded fear standard "simply by proving membership in the targeted group." *Id.* at 852 (emphasis in original). When there is such "a pattern or practice" in the subject country of persecuting members of a statutorily defined group of which the alien is a part, 8 C.F.R. § 208.13(b)(2), the INS recognizes "group persecution as sufficient in itself to establish eligibility for asylum in certain circumstances," *Kotasz*, 31 F.3d at 852.

Second, in non-pattern or practice cases, while "members of the disfavored groups are not threatened by systematic persecution of the group's entire membership, the fact of group membership nonetheless places them at some risk." *Id.* at 853. In these cases "there is a significant correlation between the asylum petitioner's showing of group persecution and the rest of the evidentiary showing necessary to establish a particularized threat of persecution." *Id.* In other words, "the more egregious the showing of group persecution—the greater the risk to all

members of the group—the less evidence of individualized persecution must be adduced." *Id.*

The majority's blanket statement that an alien must present evidence "that he will be *singled out* for persecution," fails to engage in this weighing that the complex relationship between group and individual targeting requires. Mohammed's showing of the government's human rights record and serious abuses committed against draft-eligible Eritreans is egregious enough that a more particularized threat of persecution against him was not necessary.

CONCLUSION

We show deference to the IJ and the BIA, but we are not a mere rubber stamp for their determinations. *See de Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1013 (11th Cir. 2008) (vacating the BIA's decision when substantial evidence did not support the findings of the IJ). It seems as though the IJ decided on a result before weighing the evidence before him, failing to consider the objective reports and evidence produced by Mohammed in support of his application for asylum and withholding of removal, basing his decision solely on an adverse credibility determination. Since the IJ and the BIA neglected their duty to consider all of the evidence in support of the petition, I would remand this matter back for reconsideration. *See Gonzales v. Thomas*, 547 U.S. 183, 186, 126 S. Ct. 1613, 1615, 164 L. Ed. 2d 358 (2006) ("A court of appeals is not generally empowered to

conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry. Rather, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.") (citations and quotations omitted). *See also Jean-Pierre v. U.S. Att'y Gen.*, 500 F.3d 1315, 1326 (11th Cir. 2007).

I respectfully dissent.